WIGGINS, Justice.
*781 An applicant filed a postconviction-relief action claiming he was actually innocent although he knowingly and voluntarily pled guilty to the charged crimes. He based his actual-innocence claim on a recantation by the victim. The district court granted the State's motion for summary dismissal/summary judgment, ruling the applicant cannot use the recantation to attack his knowing and voluntary guilty pleas because the recantation was extrinsic to the pleas. The applicant appealed, and we transferred the case to our court of appeals. The court of appeals affirmed. The applicant sought further review, which we granted.
On further review, we overrule our cases holding that defendants may only attack the intrinsic nature-the voluntary and intelligent character-of their pleas. We now hold the Iowa Constitution allows freestanding claims of actual innocence, so applicants may bring such claims to attack their pleas even though they entered their pleas knowingly and voluntarily. Accordingly, we adopt a freestanding claim of actual innocence that applicants may bring under our postconviction-relief statute.[1] Therefore, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case to the district court for further consideration consistent with this opinion.
I. Background Facts and Proceedings.
On December 19, 2006, the State filed a trial information charging Jacob Lee Schmidt with sexual abuse in the third degree in violation of Iowa Code section 709.4(1) (2005). On March 23, 2007, the State moved to amend the trial information to charge Schmidt with two additional counts of sexual abuse in the third degree in violation of section 709.4(2)(b ) (counts II and III) and one count of incest in violation of section 726.2 (count IV). The district court granted the motion.
The minutes of testimony attached to the original trial information and the police *782 offense report reveal that witnesses would provide the following testimony. On February 25, 2006, Schmidt, then age seventeen, visited the home of his stepfather, Peter, and his newly turned fourteen-year-old half-brother, B.C., with whom Schmidt shares the same mother. Peter is B.C.'s father. Peter left Schmidt and B.C. alone at the house to visit his girlfriend. Upon Peter's departure, Schmidt ordered B.C. into the bedroom and forced him to get on his knees on the mattress with his pants down. B.C. complied. Schmidt then removed his own pants, got on his knees behind B.C., and attempted anal sex.
Peter realized he had forgotten his cigarettes and went back home to retrieve them. Once inside, he saw neither Schmidt nor B.C. in the living room, where they had been up until his departure. Peter thought this was strange, so he looked around the home and eventually opened the bedroom door and saw Schmidt attempting to penetrate B.C. anally. Peter yelled, "What the hell are you doing!" and told Schmidt to "get the hell out of the house." Schmidt left the house, and Peter called the police.
Officers Todd Ferry and Kevin Heineman responded. Officer Ferry took Peter out to the squad car to interview him while Officer Heineman spoke to B.C. inside the home. Because Peter could not write or spell well, Officer Ferry used the in-car camera to record Peter's interview.
Meanwhile, B.C. recounted what had happened to Officer Heineman. B.C. stated he was "not afraid," and Schmidt had only threatened him on a previous occasion when Schmidt actually penetrated him approximately two or three months ago. Schmidt had told B.C. not to tell anyone unless B.C. wanted to get hurt. B.C. defined "penetrate" as "when he actually went inside his anal area." B.C. stated he was "positive" Schmidt did not penetrate him this time and "no part of his body hurt." All B.C. wanted was for the police to arrest Schmidt. Officer Heineman asked B.C. to fill out a witness statement and realized B.C. had difficulty with spelling and writing. Officer Heineman did not have B.C. continue writing the witness statement after B.C. had written three or four words.
Peter's home landline phone rang, and Officer Heineman answered it. Shanna, Schmidt and B.C.'s mother, was on the other end of the phone. She stated Schmidt had come to her home and she was going to take him to Mercy Hospital because he was having suicidal thoughts. At the hospital, Shanna advised Officer Ferry that Schmidt said Peter was lying about the whole incident.
Officer Christopher Groves followed up on the case. He asked to interview Schmidt who declined on the advice of his lawyer. Officer Groves described B.C. as "lower functioning" and stated he did not interview him because it was "very evident" he could "lead him [to] answers." Officer Groves thus scheduled B.C. for an interview with the Child Advocacy Center, which conducted a videotaped interview on March 2.
During the March 2 interview, B.C. told the interviewer "[Schmidt] tried to molest him." B.C. stated Schmidt had penetrated him on at least one occasion, and "it hurt and he tried to escape." He was thirteen at the time. B.C. stated he had sucked Schmidt's penis before but could not say how many times this occurred.
On April 2, 2007, Schmidt entered into a plea agreement. He agreed to plead guilty to assault with intent to commit sexual abuse, an aggravated misdemeanor in violation of Iowa Code section 709.11 (amended count I) and incest (count IV). The State agreed to dismiss the two other *783 counts of sexual abuse in the third degree (counts II and III) given the district court sentenced Schmidt according to the plea agreement.
That same day, during the combined plea and sentencing hearing, the court reviewed the consequences of pleading guilty with Schmidt. Schmidt informed the court he understood the rights he was giving up and wished to plead guilty to the charges. Schmidt acknowledged the minutes of testimony accurately described what he did. The court reviewed the factual basis for each count, and Schmidt confirmed he understood. The court accepted Schmidt's pleas and convicted him of assault with intent to commit sexual abuse and incest. Pursuant to the plea agreement, the court entered sentences of incarceration to run consecutively for a total term not to exceed seven years. Schmidt did not appeal this decision.
On June 23, 2014, Schmidt filed an application for postconviction relief under Iowa Code section 822.2(1)(d ) (2014). In support of his application, he contended B.C. recanted his story by "com[ing] forward with the truth." Schmidt further claimed, "I was not guilty. I was scared so I pled guilty [be]cause I was fac[ing] over [fifty] years." Schmidt alleged the victim's recantation was new evidence supporting postconviction relief. In its answer, the State denied "each and every ground for postconviction relief."
On May 14, 2015, the State filed a motion for summary dismissal/summary judgment, making two arguments. First, the State argued the three-year statute of limitations pursuant to Iowa Code section 822.3 procedurally barred Schmidt's postconviction-relief application.
Second, on the merits, the State asserted Schmidt's "application [was] in direct contradiction to the record as well as in direct contradiction to his voluntary and knowing plea[s] of guilty." It claimed Schmidt pled guilty after an extensive colloquy, knowing his involvement or noninvolvement in the alleged sexual act and the evidence against him.
On May 28, Schmidt filed a resistance, arguing B.C.'s recantation was "new evidence [that] prevented earlier filing [of his postconviction-relief application] and [that] establishes actual innocence." Schmidt included B.C.'s affidavit. In his affidavit, B.C. stated under oath,
When I was 21 years old, I told other people that [Schmidt] had never touched me in a sexual way or sexually abused me. I didn't tell anyone before that date that nothing had really happened, and so [Schmidt] couldn't have known before then. I decided to tell people when I turned 21 since I was a full adult at that time.
On July 30, the district court granted the State's motion for summary dismissal/summary judgment. It did not rule on the statute of limitations. Rather, relying on an unpublished court of appeals decision, it stated that "newly discovered exculpatory evidence does not provide grounds to withdraw a guilty plea unless intrinsic to the plea itself." In other words, the court decided Schmidt waived his claim of actual innocence by pleading guilty. Schmidt appealed.
We transferred the case to the court of appeals. Affirming the district court's grant of summary dismissal/summary judgment, the court of appeals reasoned the alleged recantation was not intrinsic to Schmidt's guilty pleas. It therefore concluded, "[B]ecause Schmidt's convictions were entered following his guilty pleas, he cannot challenge those convictions in a [postconviction-relief] action on the basis of newly discovered evidence in the form of his alleged victim's recantation."
*784 Schmidt filed an application for further review, which we granted.
II. Scope of Review.
"[T]he principles underlying [a] summary judgment procedure apply to motions of either party for disposition of an application for postconviction relief without a trial on the merits." Manning v. State , 654 N.W.2d 555, 560 (Iowa 2002). In other words, for a summary disposition to be proper, the State must be able to prevail as if it were filing a motion for summary judgment in a civil proceeding. Castro v. State , 795 N.W.2d 789, 793 (Iowa 2011) ("The standards for summary judgment in postconviction[-]relief actions are analogous to summary judgment in civil proceedings.").
We review summary dismissals of postconviction-relief applications for errors at law. Id. at 792. Applying summary judgment principles, summary disposition is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show ... there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." Davis v. State , 520 N.W.2d 319, 321 (Iowa App. 1994) (quoting Iowa R. Civ. P. 237(c), now r. 1.981(3) ). The moving party bears the burden of showing that no material fact exists. C & J Vantage Leasing Co. v. Wolfe , 795 N.W.2d 65, 73 (Iowa 2011). We view the record in the light most favorable to the nonmoving party. Eggiman v. Self-Insured Servs. Co. , 718 N.W.2d 754, 758 (Iowa 2006). We also draw all legitimate inferences from the evidence in favor of the nonmoving party. C & J Vantage , 795 N.W.2d at 73.
III. Analysis.
A. Whether Schmidt's Guilty Pleas Preclude Him from Pursuing His Actual-Innocence Claim. The broad issue we must decide is whether Schmidt's pleas preclude him from pursuing a postconviction-relief action. The narrow issue we must address is whether Schmidt's pleas preclude him from bringing his actual-innocence claim because such a challenge is extrinsic to his pleas.
Under our current law,
[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea ....
State v. Utter , 803 N.W.2d 647, 651 (Iowa 2011) (alteration in original) (quoting Tollett v. Henderson , 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973) ). It is on this basis the district court dismissed and the court of appeals affirmed the dismissal of Schmidt's postconviction-relief action. The time has come to reevaluate this law in regards to an actual-innocence claim. We now turn to the first issue and begin our analysis by examining our postconviction-relief statute.
Iowa Code section 822.2 provides, "Any person who has been convicted of, or sentenced for, a public offense and who claims any of the following may institute, without paying a filing fee, a proceeding under this chapter to secure relief." Iowa Code § 822.2(1).
We have previously discussed the meaning of the term "conviction" under section 822.2 in Daughenbaugh v. State , 805 N.W.2d 591, 597-99 (Iowa 2011). There we said,
We begin our discussion of Iowa law by examining our approach to statutory interpretation *785 of the term "conviction." Like many other jurisdictions, we have emphasized that "conviction" has an "equivocal meaning" that depends upon the context in which it is used. Like many other states, we have said that, when the word is used in its general and popular sense, conviction means the establishment of guilt independent of judgment and sentence. On the other hand, when the term "conviction" is used in its technical legal sense, it requires a formal adjudication by the court and the formal entry of a judgment of conviction.
Id . at 597 (citations omitted). We then stated our postconviction statute uses the word conviction in its " 'strict legal sense' and not in its broader popular context." Id . at 598-99. Thus, the technical legal sense of the word conviction requires adjudication of guilt and the entry of a judgment. Id . at 599.
In another case, we stated the acceptance by the court of a defendant's plea "constitutes a conviction of the highest order" and authorizes the court to sentence the defendant as though the factfinder returned a guilty verdict. State v. Kobrock , 213 N.W.2d 481, 483 (Iowa 1973). That is what happened here: Schmidt entered his pleas, the court accepted his pleas, and sentenced him accordingly. In doing so, the court adjudicated him guilty and entered judgment. Adjudication and entry of judgment constitute conviction, and conviction is a requirement for filing a postconviction-relief action under section 822.2. See Daughenbaugh , 805 N.W.2d at 599. Thus, Schmidt's pleas do not preclude him from filing a postconviction-relief action.
The second issue is whether Schmidt faces any other barriers to filing his postconviction-relief action after pleading guilty. Specifically, the issue is whether Schmidt may attack his pleas by bringing an actual-innocence claim even though such a challenge is extrinsic to his pleas. First, we discuss the current state of our caselaw regarding challenges to pleas. Second, we examine the implication of State v. Alexander , 463 N.W.2d 421 (Iowa 1990), on the possibility of challenging a plea in a postconviction-relief action based on newly discovered evidence. Third, we discuss the phenomenon of pleading guilty despite actual innocence. Lastly, we examine our legislature's codification of section 81.10, which allows postconviction-DNA testing.
A valid plea "waive[s] all defenses and the right to contest all adverse pretrial rulings." State v. Morehouse , 316 N.W.2d 884, 885 (Iowa 1982), overruled on other grounds by State v. Kress , 636 N.W.2d 12, 20 (Iowa 2001). However, the defendant may attack his or her plea when the plea itself contains intrinsic irregularities or the trial information charges no offense. See State v. Mattly , 513 N.W.2d 739, 740-41 (Iowa 1994) ; Morehouse , 316 N.W.2d at 885.
We fashioned the general rule precluding extrinsic challenges to pleas on the premise that "[a] defendant plead[s] guilty in open court, with assistance of counsel, knowingly and understandingly." State v. Delano , 161 N.W.2d 66, 73 (Iowa 1968). Thus, the defendant waives his or her rights "with respect to conduct of criminal prosecution and any objection to prior proceedings which may include a violation of his [or her] rights." Id. This waiver could preclude certain postconviction-relief actions under section 822.2(1)(a ), which provides relief for a "conviction or sentence [that] was in violation of the Constitution of the United States or the Constitution or laws of this state." Iowa Code § 822.2(1)(a ).
It does not preclude relief under section 822.2(1)(d ), which provides relief when "[t]here exists evidence of material facts, *786 not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice." Id. § 822.2(1)(d ) ; accord Alexander , 463 N.W.2d at 423 (referring to Iowa Code section 663A.2(4) (1989), now codified at section 822.2(1)(d ) (2014) ).
In Alexander , the defendant pled guilty to going armed with a dangerous weapon. 463 N.W.2d at 421. After his plea and sentencing, the defendant filed a motion for new trial based on newly discovered evidence in the form of witness testimony supporting a theory of justification or self-defense. Id . at 422. We examined then rule 23(2)(a) of our rules of criminal procedure. That rule stated,
The application for a new trial ... shall be made not later than forty-five days after plea of guilty [or] verdict of guilty, ... but in any case not later than five days before the date set for pronouncing judgment, but where based upon newly discovered evidence may be made after judgment as well.
Id. (quoting Iowa R. Crim. P. 23(2)(a), now r. 2.24(2)(a) (emphasis added) ).
We reasoned "[l]ogic would suggest that the concept of new trial should have as its predicate the existence of a former trial." Id . Based on the legislative history, we then concluded inclusion of the phrase "plea of guilty" in rule 23(2)(a) was inadvertent and erroneous, and therefore held rule 23(2)(a) as written did not allow for a new trial following a guilty plea. Id . at 422-23. We buttressed this conclusion by stating,
We are confident that the legislature did not intend to give admittedly guilty persons the unfettered right to recant their admission and proceed to trial on the ground of newly discovered evidence or any other ground not intrinsic to the plea.
Id . at 423.
We reasoned "[n]otions of newly discovered evidence simply have no bearing on a knowing and voluntary admission of guilt." Id . However, we noted the defendant was not without a remedy. Id. We stated the remedy the defendant sought was available under Iowa Code section 663A.2(4) (1989), now codified at section 822.2(1)(d ) (2014), when challenging his plea based on newly discovered evidence. Id. Thus, in Alexander , we left the door open for challenging a plea in a postconviction-relief action based on newly discovered evidence.
We now examine the phenomenon of actually innocent people pleading guilty. The National Registry of Exonerations reported that seventy-four exonerations in 2016 arose from pleas. The National Registry of Exonerations, Exonerations in 2016 2 (2017), www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2016.pdf.
We have stated "criminal cases in general, and guilty pleas in particular, are characterized by considerable uncertainty[.]" State v. Carroll , 767 N.W.2d 638, 642 (Iowa 2009).
[T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel must predict how the facts, as he understands them, would be viewed by a court. If proved, would those facts convince a judge or jury of the defendant's guilt? On those facts would evidence seized without a warrant *787 be admissible? Would the trier of fact on those facts find a confession voluntary and admissible? Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.
Id. (quoting McMann v. Richardson , 397 U.S. 759, 769-70, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970) ).
Pleading guilty despite actual innocence is not limited to uncertainty. One of our recent cases recognizes that actually innocent people plead guilty for many different reasons. See Rhoades v. State , 880 N.W.2d 431, 436-38 (Iowa 2016).
People have been known to confess to crimes they did not commit during police interrogations[2] and such confessions bleed into their decisions to plead guilty. "A false coerced confession may undermine the accuracy of a guilty plea ...." Kevin C. McMunigal, Guilty Pleas, Brady Disclosure, and Wrongful Convictions , 57 Case W. Res. L. Rev. 651, 656 (2007). Because such a confession increases the chances of conviction at trial, defendants face pressure to plead guilty even when they are actually innocent. Id. ; see also Rodney Uphoff, Convicting the Innocent: Aberration or Systemic Problem? , 2006 Wis. L. Rev. 739, 796 (2006) [hereinafter Uphoff] ("The difficulty of overcoming so-called confessions and of successfully attacking a positive eyewitness identification are just two of a host of factors that may push a defendant into a guilty plea regardless of his or her actual innocence.").
Moreover, innocent defendants plead guilty for reduced charges and shorter sentences. Rachel E. Barkow, Separation of Powers and the Criminal Law , 58 Stan. L. Rev. 989, 1034 (2006) [hereinafter Barkow]; see also Robert E. Scott & William J. Stuntz, Plea Bargaining as Contract , 101 Yale L.J. 1909, 1912 (1992) [hereinafter Scott & Stuntz] ("Defendants accept bargains because of the threat of much harsher penalties after trial; they are thus forced to give up the protections that the trial system's many formalities provide."). The reality of plea bargaining is that "[defendants] who do take their case to trial and lose receive longer sentences than even Congress or the prosecutor might think appropriate, because the longer sentences exist on the books largely for bargaining purposes." Barkow, 58 Stan. L. Rev. at 1034.
Simply put, in economic terms, defendants engage in a cost-benefit analysis. Entering into a plea agreement is not only rational but also more attractive than dealing with the uncertainty of the trial process and the possibility of harsher sentences. Indeed, "even with competent counsel, going to trial can be incredibly risky business." Uphoff, 2006 Wis. L. Rev. at 799. We stated in Rhoades that "[w]hen the deal is good enough, it is rational to refuse to roll the dice, regardless of whether one believes the evidence establishes guilt beyond a reasonable doubt, and regardless of whether one is factually innocent." 880 N.W.2d at 436-37 (alteration in *788 original) (quoting Russell D. Covey, Longitudinal Guilt: Repeat Offenders, Plea Bargaining, and the Variable Standard of Proof , 63 Fla. L. Rev. 431, 450 (2011) ); accord Jed S. Rakoff, Why Innocent People Plead Guilty, N.Y. Rev. Books (Nov. 20, 2014), www.nybooks.com/articles/2014/11/20/why-innocent-people-pleadguilty/[https://perma.cc/LT8T-XKAV] ("If [the defendant's] lawyer can obtain a plea bargain that will reduce his likely time in prison, he may find it 'rational' to take the plea.").
A plea does not weed out the innocent. Rather, a plea is an explicit agreement[3] between the prosecutor and the defendant that "establishes a 'going rate.' " John L. Kane, Plea Bargaining and the Innocent , The Marshall Project (Dec. 26, 2014, 1:05 PM), https://www.themarshallproject.org/2014/12/26/plea-bargaining-and-the-innocent [https://perma.cc/R5FU-Y3T4]. Specifically, "[t]he anticipated sentence is the central concern in the negotiation[,]" but "[t]he problem ... is that both innocent and guilty defendants are placed in the same pot and the goal is to achieve the appearance of justice, not the realization of it."Id. ; see also Missouri v. Frye , 566 U.S. 134, 144, 132 S.Ct. 1399, 1407, 182 L.Ed.2d 379 (2012) ("In today's criminal justice system ... the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant."). Pleading guilty does not automatically mean the defendant is actually guilty. Sometimes, an innocent defendant is choosing the lesser of two evils: pleading guilty despite his or her actual innocence because the odds are stacked up against him or her, or going to trial with the risk of losing and the prospect of receiving a harsher sentence.
Innocent defendants may also plead guilty in the face of pressure from prosecutors and even their own defense counsels. Today, "our criminal justice system is almost exclusively a system of plea bargaining, negotiated behind closed doors and with no judicial oversight." Jed S. Rakoff, Why Innocent People Plead Guilty , N.Y. Rev. Books (Nov. 20, 2014). Behind these closed doors, prosecutors have broad discretion: "the prosecutor-dictated plea bargain system, by creating such inordinate pressures to enter into plea bargains, appears to have led a significant number of defendants to plead guilty to crimes they never actually committed." Id. ; see also Innocence Project, Why Are People Pleading Guilty to Crimes They Didn't Commit? (Nov. 25, 2015), https://www.innocenceproject.org/why-are-people-pleading-guilty-to-crimes-they-didnt-commit/ [https://perma.cc/3CEX-WEW2].
H. Lee Sarokin, a former federal judge, described the plea bargaining process as involving "intimidation by the prosecution and incompetence by the defense." H. Lee Sarokin, Why Do Innocent People Plead Guilty? , HuffPost (May 29, 2012, 4:39 PM), https://www.huffingtonpost.com/judge-h-lee-sarokin/innocent-peopleguilty-pleas_b_1553239.html [https://perma.cc/6PSQ-6QW4]. He illustrated,
The defendant, frightened, most often poor, uneducated, a minority member is advised that a trial is likely to end with a conviction and a long sentence, whereas a plea will guarantee a much shorter sentence. Despite his protestations of innocence, the defendant seeks guidance frequently from an over-worked, underpaid defense lawyer who would much prefer a quick deal rather than a long drawn out trial. Of course, not all defense *789 counsel fit that description. Many do not, but even the best and most devoted are required to put this draconian choice to their clients-a guaranteed short sentence versus a potentially long one-possibly life in prison.
Id. We again emphasize the prosecutor's promise of a shorter sentence is more attractive than going to trial and possibly losing. Defendants, even those who are actually innocent and especially those who are indigent, have more to lose by going to trial than by pleading guilty.
Finally, we review the current legislative policy regarding guilty pleas and actual innocence. In 2005, in passing Iowa Code section 81.10, the legislature recognized a person who pleads guilty could be actually innocent. See 2005 Iowa Acts ch. 158, § 10 (codified at Iowa Code § 81.10 ). Section 81.10 allows a convicted defendant to make a motion that, if granted, would require DNA testing "on evidence collected in the case for which the person stands convicted." Iowa Code § 81.10 (2014). The motion must state the following:
b . The facts of the underlying case, as proven at trial or admitted to during a guilty plea proceeding .
....
h. The type of inculpatory evidence admitted into evidence at trial or admitted to during a guilty plea proceeding .
....
l. Why the DNA evidence would have changed the outcome of the trial or invalidated a guilty plea if DNA profiling had been conducted prior to the conviction.
Id. § 81.10(2)(b ), (h ), and (l ) (emphases added).
After the convicted defendant files the motion and the county attorney files an answer to the motion, the court may order a hearing on the motion. Id. § 81.10(3), (6). The court must grant the motion if all of the requirements of section 81.10(7) apply. One of the requirements recognizes the applicability of DNA exoneration to pleas. Id. § 81.10(7)(d ). Section 81.10(7)(d ) provides, "The evidence subject to DNA analysis is material to, and not merely cumulative or impeaching of, evidence included in the trial record or admitted to at a guilty plea proceeding ." Id. (emphasis added). This legislation reaffirms the fact that even actually innocent persons do in fact plead guilty and should have a chance for exoneration.
In light of these recent developments, we hold convicted defendants can attack their pleas when claiming actual innocence even if the attack is extrinsic to the pleas. We know people plead guilty for all sorts of reasons. Many of these reasons are unrelated to whether the defendant actually committed the crime. Additionally, the legislature has set the policy that the state should not incarcerate actually innocent people if DNA evidence exonerates them, regardless of their pleas. We see no reason why we should treat people exonerated by DNA evidence differently from people exonerated by other reliable means. For example, when the court determines the police planted evidence, such as drugs, why should that defendant remain in prison simply because he or she pled guilty to a reduced charge in light of the overwhelming evidence of his or her guilt?
What kind of system of justice do we have if we permit actually innocent people to remain in prison? See Engesser v. Young , 856 N.W.2d 471, 484 (S.D. 2014) ("Punishment of the innocent may be the worst of all injustices." (quoting Jenner v. Dooley , 590 N.W.2d 463, 471 (S.D. 1999) ) ); see also In re Kaufmann , 245 N.Y. 423, 157 N.E. 730, 733 (1927) (noting that in circumstances in which a convicted individual establishes his innocence, "the *790 administration of justice would be subject to reproach if an implacable law of remedies were to close the door forever upon the hope of vindication").[4] It is time that we refuse to perpetuate a system of justice that allows actually innocent people to remain in prison, even those who profess guilt despite their actual innocence.
Accordingly, we overrule our cases that do not allow defendants to attack their pleas based on extrinsic grounds when they claim actual innocence. Therefore, we hold Schmidt's pleas do not preclude his actual-innocence claim merely because he pled guilty to the charges.
B. An Actual-Innocence Claim Under Iowa Law. We have never addressed whether, under our postconviction-relief statute, a claim of actual innocence constitutes a gateway claim or a freestanding claim implicating the Iowa Constitution. Additionally, we have neither discussed the standard courts must apply when confronted with actual-innocence claims nor the vehicle defendants may use to bring such claims.
1. Freestanding claim versus gateway claim. In the federal system, a habeas petitioner may overcome a procedural bar to habeas review by bringing a gateway claim of actual innocence such that the petitioner may obtain review of the underlying constitutional merits of his or her procedurally defaulted claim. Herrera v. Collins , 506 U.S. 390, 404, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (1993) ; see also In re Davis , 557 U.S. 952, 955, 130 S.Ct. 1, 3, 174 L.Ed.2d 614 (2009) (Scalia, J., dissenting). "Federal habeas review of state convictions has traditionally been limited to claims of constitutional violations occurring in the course of the underlying state criminal proceedings." Herrera , 506 U.S. at 416, 113 S.Ct. at 869. The United States Supreme Court has declined to stretch the reach of federal habeas review to freestanding claims of actual innocence when there is a state avenue to provide for pardons. Montoya v. Ulibarri , 142 N.M. 89, 163 P.3d 476, 482 (2007) ; People v. Cole , 1 Misc.3d 531, 765 N.Y.S.2d 477, 484 (Sup. Ct. 2003).
To overcome a procedural bar to federal habeas review, a petitioner must generally show "cause for the default and prejudice from the asserted error." House v. Bell , 547 U.S. 518, 536, 126 S.Ct. 2064, 2076, 165 L.Ed.2d 1 (2006). "Cause" turns on the question of "whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier , 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). The United States Supreme Court has vaguely defined "prejudice" but "prejudice" at least entails an "actual prejudice" standard that requires a showing that "is 'greater than the showing required to establish plain error on direct appeal.' " Engle v. Isaac , 456 U.S. 107, 134-35, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783 (1982) (quoting Henderson v. Kibbe , 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37, 52 L.Ed.2d 203 (1977) ).
Absent the showing of cause and prejudice,
a court may not reach the merits of: (a) successive claims that raise grounds identical to grounds heard and decided on the merits in a previous petition, ...; (b) new claims, not previously raised, which constitute an abuse of the writ , ...; or (c) procedurally defaulted claims *791 in which the petitioner failed to follow applicable state procedural rules in raising the claims[.]
Sawyer v. Whitley , 505 U.S. 333, 338, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 269 (1992) (citations omitted).
The procedural default doctrine arises from the principles of comity and finality, and the conservation of judicial resources. House , 547 U.S. at 536, 126 S.Ct. at 2076. However, in certain circumstances, such principles "must yield to the imperative of correcting a fundamentally unjust incarceration." Id. (quoting Carrier , 477 U.S. at 495, 106 S.Ct. at 2649 ); see Kuhlmann v. Wilson , 477 U.S 436, 454, 106 S.Ct. 2616, 2627, 91 L.Ed.2d 364 (1986) (holding the miscarriage-of-justice exception allows successive claims given the petitioner shows "under the probative evidence he has a colorable claim of factual innocence"); Carrier , 477 U.S. at 496, 106 S.Ct. at 2649 (holding "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent," the merits of a procedurally defaulted claim could be reached). For purposes of this appeal, we focus on the fundamental-miscarriage-of-justice, or actual-innocence, exception.
In Schlup v. Delo , in considering a petitioner's actual-innocence claim accompanied by an assertion of constitutional violations at trial, the Supreme Court explained what constitutes a gateway claim and articulated the gateway standard. 513 U.S. 298, 315-17, 326-27, 115 S.Ct. 851, 861-62, 867, 130 L.Ed.2d 808 (1995). The Court defined the petitioner's gateway claim of actual innocence as "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Id. at 315, 115 S.Ct. at 861 (quoting Herrera , 506 U.S. at 404, 113 S.Ct. at 862 ). In other words, the petitioner's claim of actual innocence does not alone provide a basis for a court to vacate his conviction. See id. Rather, his claim of actual innocence depends on the validity of his underlying constitutional claims. See id .
Schlup held a petitioner asserting a gateway claim must demonstrate that in light of all the evidence, including the new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id. at 327, 115 S.Ct. at 867 (adopting "the Carrier 'probably resulted' standard"); accord Kenfield v. State , 384 Mont. 322, 377 P.3d 1207, 1211-12 (2016) ; Berry v. State , 131 Nev. ----, 363 P.3d 1148, 1155 (2015) ; In re Personal Restraint of Weber , 175 Wash.2d 247, 284 P.3d 734, 740 (2012) (en banc). This more-likely-than-not standard "ensures that petitioner's case is truly 'extraordinary,' ... while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." Schlup , 513 U.S. at 327, 115 S.Ct. at 867 (quoting McCleskey v. Zant , 499 U.S. 467, 494, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991) ). The petitioner does not need to establish with absolute certainty that he or she is innocent. House , 547 U.S. at 538, 126 S.Ct. at 2077. In declining to adopt a clear and convincing standard, the Court stated that actual-innocence claims "pose less of a threat to scarce judicial resources and to principles of finality and comity than do claims that focus solely on the erroneous imposition of the death penalty." Schlup , 513 U.S. at 324, 115 S.Ct. at 865.
Based on the foregoing, we carefully distinguish between the two forms of an actual-innocence claim: a gateway claim of actual innocence with an underlying constitutional challenge and a freestanding claim of actual innocence that is itself the substantive basis for relief.
*792 2. Freestanding claims of actual innocence in Iowa. Schmidt argues the "in the interest of justice" language of Iowa Code section 822.2(1)(d ), unlike federal habeas, gives a substantive basis for actual-innocence claims. Schmidt states section 822.2(1)(a ) also provides a means to raise a freestanding claim of actual innocence because "[i]f a person is convicted of a crime he did not commit[,] such a conviction violates the Iowa Constitution." Thus, Schmidt contends, because his claim of actual innocence is itself a substantive claim, it does not need to pass through the actual-innocence gateway.
The federal circuit courts of appeals remain unsettled on the question of whether a freestanding claim of actual innocence exists. John M. Leventhal, A Survey of Federal and State Courts' Approaches to a Constitutional Right of Actual Innocence: Is There a Need for a State Constitutional Right in New York in the Aftermath of CPL § 440.10(1)(G-1)? , 76 Alb. L. Rev. 1453, 1464-65 nn.83-95 (2013) (citing cases). If a freestanding claim of actual innocence exists, it would have to overcome an "extraordinarily high threshold." Id. at 1464 & n.85 (collecting cases); see also Carriger v. Stewart , 132 F.3d 463, 476 (9th Cir. 1997) ("Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction.").
At the state level, a number of jurisdictions acknowledge freestanding claims of actual innocence. Engesser , 856 N.W.2d at 481 n.3 (collecting cases and statutes that allow freestanding claims of actual innocence). States that do recognize freestanding claims of actual innocence apply varying standards. Compare People v. Washington , 171 Ill.2d 475, 216 Ill.Dec. 773, 665 N.E.2d 1330, 1337 (1996) (holding the defendant must present new evidence that is " 'of such conclusive character' as would 'probably change the result on retrial' " (quoting People v. Silagy , 116 Ill.2d 357, 107 Ill.Dec. 677, 507 N.E.2d 830, 834 (1987) ) ), with State ex rel. Amrine v. Roper , 102 S.W.3d 541, 548 (Mo. 2003) (en banc) (holding the petitioner must "make a clear and convincing showing of actual innocence that undermines confidence in the correctness of the judgment").
In Washington , the Illinois Supreme Court explicitly addressed whether a freestanding claim of actual innocence based on new evidence implicated the due process clause of the Illinois Constitution. 216 Ill.Dec. 773, 665 N.E.2d at 1335-37. In regards to procedural due process, the court reasoned "to ignore such a claim would be fundamentally unfair." Id. , 216 Ill.Dec. 773, 665 N.E.2d at 1336.
In terms of substantive due process, the court stated "[i]mprisonment of the innocent would also be so conscience shocking as to trigger operation of substantive due process." Id. It stated, "The [United States] Supreme Court rejected substantive due process as means to recognize freestanding innocence claims because of the idea that a person convicted in a constitutionally fair trial must be viewed as guilty." Id. In declining to adopt the reasoning of the United States Supreme Court, the court stated, "The stronger the claim-the more likely it is that a convicted person is actually innocent-the weaker is the legal construct dictating that the person be viewed as guilty." Id. Because "no person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence[,]" the court held the due process clause of the Illinois Constitution gives credence to freestanding claims of actual innocence and affords convicted defendants additional process.
*793 Id. , 216 Ill.Dec. 773, 665 N.E.2d at 1336-37.
In Montoya , the New Mexico Supreme Court held the New Mexico Constitution, specifically the due process clause and the prohibition against infliction of cruel and unusual punishment, provides protection to actually innocent people. 163 P.3d at 484. The court reasoned it would be "fundamentally unfair" to convict, incarcerate, or execute an innocent person. Id. The court further reasoned "the incarceration of an innocent person [fails to] advance[ ] any [acceptable] goal of punishment, and ... the punishment is indeed grossly out of proportion to the severity of the crime." Id.
We now turn to the Iowa Constitution. First, we note the Iowa Constitution vests authority to grant pardons with the Governor. Iowa Const. art. IV, § 16 ; State v. Ragland , 836 N.W.2d 107, 118 (Iowa 2013). Thus, the incarceration of an actually innocent person in Iowa does not violate the Federal Constitution. See Montoya , 163 P.3d at 482 ; Cole , 765 N.Y.S.2d at 484. We therefore address the possibility of a freestanding claim of actual innocence pursuant to Iowa constitutional jurisprudence.
The Iowa Constitution affords individuals greater rights than does the United States Constitution. See, e.g. , State v. Lyle , 854 N.W.2d 378, 395 (Iowa 2014) (noting "we expanded the reach of the Supreme Court's reasoning in a trilogy of juvenile justice cases decided under the Iowa Constitution"). Moreover, we have discretion to construe the Iowa Constitution in such a way as to "provid[e] greater protection for our citizens' constitutional rights." Nguyen v. State , 878 N.W.2d 744, 755 (Iowa 2016). Because we "jealously" safeguard our authority to interpret the Iowa Constitution on our own terms, we do not employ a lockstep approach in following federal precedent although United States Supreme Court cases are "persuasive." See State v. Ochoa , 792 N.W.2d 260, 267 (Iowa 2010).
Article I, section 9 of the Iowa Constitution prohibits the deprivation of liberty without due process of law. Iowa Const. art. I, § 9 (due process clause). We have enforced "the due process clause of article I, section 9... in a wide variety of settings." Godfrey v. State , 898 N.W.2d 844, 871 (Iowa 2017). In fact, "[t]he Iowa constitutional provision regarding due process of law is ... not a mere hortatory command, but it has been implemented, day in and day out, for many, many years." Id. We see no reason why article I, section 9 would not be enforceable for purposes of vindicating defendants who prove they are factually innocent and believe their incarceration triggers the due process clause.
An innocent person has a constitutional liberty interest in remaining free from undeserved punishment. Holding a person who has committed no crime in prison strikes the very essence of the constitutional guarantee of substantive due process. See Cole , 765 N.Y.S.2d at 485 (holding "the conviction or incarceration of a guiltless person violates elemental fairness, deprives that person of freedom of movement and freedom from punishment[,] and thus runs afoul of the due process clause of the [New York] State Constitution").
Even if defendants allege substantive due process violations, they must meet the demanding actual-innocence standard to prove the validity of their actual-innocence claims-a standard we articulate in the next section. Thus, there are limits on actual-innocence claims.
Moreover, actually innocent people should have an opportunity to prove *794 their actual innocence. Montoya , 163 P.3d at 484 (holding "the conviction, incarceration, or execution of an innocent person violates all notions of fundamental fairness" and thus actually innocent people "must be permitted to assert a claim of actual innocence"). The incarceration of actually innocent people therefore implicates procedural due process.
Article I, section 17 of the Iowa Constitution prohibits cruel and unusual punishment. Iowa Const. art. I, § 17 (cruel and unusual punishment). This prohibition "embraces a bedrock rule of law that punishment should fit the crime." Lyle , 854 N.W.2d at 384 (quoting State v. Bruegger , 773 N.W.2d 862, 872 (Iowa 2009) ); accord Roper v. Simmons , 543 U.S. 551, 560, 125 S.Ct. 1183, 1190, 161 L.Ed.2d 1 (2005) ("[T]he Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions."). Applying this bedrock principle, we believe "punishing an actually innocent person is disproportionate to the crime (or lack of crime) committed and violates the cruel and inhuman treatment clause." Cole , 765 N.Y.S.2d at 485 ; accord Herrera , 506 U.S. at 431, 113 S.Ct. at 876 (Blackmun, J., dissenting) (noting punishment "grossly out of proportion to the severity of the crime" is unconstitutional and excessive (quoting Coker v. Georgia , 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion) ) ).
Furthermore, we agree with Justice Blackmun's dissent in Herrera that "it is crystal clear that the execution of an innocent person is 'at odds with contemporary standards of fairness and decency.' " 506 U.S. at 431, 113 S.Ct. at 876 (quoting Spaziano v. Florida , 468 U.S. 447, 465, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 (1984), overruled on other grounds by Hurst v. Florida , 577 U.S. ----, ----, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016) ). We believe Justice Blackmun's reasoning also applies to the conviction and incarceration of an innocent person because "the basic concept underlying the prohibition against cruel and unusual punishment 'is nothing less than the dignity' of humankind." Lyle , 854 N.W.2d at 384 (quoting Trop v. Dulles , 356 U.S. 86, 100, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958) ).
We reject the notion that the rationale used in cases involving trials cannot be applied to those involving pleas.[5] We find these cases informative because the same policy reason informs convictions based after trials as those based on pleas. See Ex parte Tuley , 109 S.W.3d 388, 391-92 (Tex. Crim. App. 2002) ; see also People v. Tiger , 149 A.D.3d 86, 48 N.Y.S.3d 685, 700-01 (2017) (citing Ex parte Tuley , 109 S.W.3d at 393 ) (holding a defendant's plea does not bar the defendant from bringing a freestanding claim of actual innocence). This policy reason is protecting against violations of constitutional principles.
The Texas Court of Criminal Appeals permits freestanding claims of actual innocence even if the applicant pled guilty. Ex parte Tuley , 109 S.W.3d at 393. In Tuley , the applicant pled guilty to aggravated sexual assault. Id. at 390. Years later, the applicant pursued postconviction relief when the complainant recanted her allegation. Id. The court sought to answer the question of whether the applicant's plea precluded his freestanding actual-innocence claim. Id. It reasoned the policy behind allowing freestanding actual-innocence claims was to protect innocent individuals from punishment. Id. at 390-91.
*795 Specifically, the court reasoned, this policy "is the same for an applicant regardless of whether his case was heard by a judge or jury or whether he [pled] guilty or not guilty." Id.
The court further reasoned that "[c]onvicting courts should ... give great respect to knowing, voluntary, and intelligent pleas of guilty." Id. at 391. However, "we should not foreclose relief because a defendant [pled] guilty when the policy behind granting relief on a bare innocence claim is the same." Id. Moreover, "[t]here is nothing equitable about permitting an innocent person to remain in prison when he produces new evidence that unquestionably shows that he did not commit the offense for which he is incarcerated." Id. at 392. Thus, the court held an applicant must "show[ ] by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence." Id. We agree with the Texas Court of Criminal Appeals that the same rudimentary policy reason-safeguarding against violations of due process-form a substratum for claims of actual innocence, regardless of whether defendants pled guilty or went to trial.
Therefore, we now find the Iowa Constitution permits freestanding claims of actual innocence. Furthermore, freestanding claims of actual innocence permitted by the Iowa Constitution are available to applicants even though they pled guilty.
3. The standard to apply to freestanding actual-innocence claims. States that have adopted freestanding actual-innocence claims require a higher burden than that of a gateway claim for an applicant to succeed. We again note the United States Supreme Court adopted a more-likely-than-not standard in proving gateway claims of actual innocence. Schlup , 513 U.S at 327, 115 S.Ct. 851 at 867.
In Jamison v. State , a case involving newly discovered evidence that would allegedly support an applicant's self-defense theory, the South Carolina Supreme Court adopted a stringent standard.[6] 410 S.C. 456, 765 S.E.2d 123, 130 (2014).
There the court held,
[W]hen a [postconviction-relief] applicant seeks relief on the basis of newly discovered evidence following a guilty plea, relief is appropriate only where the applicant presents evidence showing that (1) the newly discovered evidence was discovered after the entry of the plea and, in the exercise of reasonable diligence, could not have been discovered prior to the entry of the plea; and (2) the newly discovered evidence is of such a weight and quality that, under the facts and circumstances of that particular case, the "interest of justice" requires the applicant's guilty plea to be vacated . In other words, a [postconviction-relief] applicant may successfully disavow his or her guilty plea only where the interests of justice outweigh the waiver and solemn admission of guilt encompassed in a plea of guilty and the compelling interests in maintaining the finality of guilty-plea convictions.
Id. (emphasis added).
We believe the standard the South Carolina Supreme Court has adopted is not only amorphous but also impractical. What does it mean for the "interests of justice" to outweigh the guilty plea waiver? The *796 permutations are endless. The standard set by the South Carolina Supreme Court does not appear to be any different from altogether barring an applicant's postconviction-relief action.
Similarly, the California Supreme Court requires applicants to meet a high burden such that the evidence "undermine[s] the entire prosecution case and point[s] unerringly to innocence or reduced culpability." In re Clark , 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729, 739 (1993) ; accord In re Bell , 42 Cal.4th 630, 67 Cal.Rptr.3d 781, 170 P.3d 153, 157 (2007).
The Texas Court of Criminal Appeals originally adopted a very burdensome standard, requiring applicants claiming actual innocence to demonstrate "based on the newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could find proof of guilt beyond a reasonable doubt." State ex rel. Holmes v. Honorable Ct. of Appeals , 885 S.W.2d 389, 399 (Tex. Crim. App. 1994) (en banc), overruled by Ex parte Elizondo , 947 S.W.2d 202, 206 (Tex. Crim. App. 1996) (en banc).
However, in lowering the burden of proof, the court in Ex parte Elizondo stated the Holmes standard was too high because it would be "theoretically impossible" to attain relief. Ex parte Elizondo , 947 S.W.2d at 205. The court reasoned "exculpatory evidence can never outweigh inculpatory evidence under [the] standard" set in State ex rel. Holmes . Id. Thus, the court adopted a clear and convincing standard requiring "the petitioner must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." Id. at 209.
A number of states apply the Elizondo clear and convincing standard. See, e.g. , Roper , 102 S.W.3d at 548 ; Montoya , 163 P.3d at 486 ; Cole , 765 N.Y.S.2d at 486 ; Miller v. State , 340 P.3d 795, 796 (Utah Ct. App. 2014) (per curiam); see also Miller v. Comm'r of Corr. , 242 Conn. 745, 700 A.2d 1108, 1130-31 (1997) (adopting a clear and convincing standard and also requiring the petitioner to show that "no reasonable fact finder would find the petitioner guilty").
Other jurisdictions have codified freestanding claims of actual innocence. The Maryland statute uses a standard of "substantial or significant possibility that the result may have been different." Md. Code. Ann., Crim. Proc. § 8-301(a)(1) (West, Westlaw through ch. 1-4 2018 Reg. Sess.). The statute gives the court discretion to "set aside the verdict, resentence, grant a new trial, or correct the sentence." Id. § 8-301(f)(1). The Maryland Court of Special Appeals, however, held a defendant who has pled guilty could not petition for a writ of actual innocence. Yonga v. State , 221 Md.App. 45, 108 A.3d 448, 460 (2015), aff'd 446 Md. 183, 130 A.3d 486, 492 (2016).
In discussing freestanding claims of actual innocence, the District of Columbia statute explicitly assigns different remedies upon meeting the respective standards. D.C. Code Ann. § 22-4135 (West, Westlaw through Feb. 20, 2018). If the court determines "it is more likely than not that the movant is actually innocent of the crime," the remedy is to grant a new trial. Id. § 22-4135(g)(2). If the court determines "by clear and convincing evidence that the movant is actually innocent of the crime," the remedy is to vacate the conviction. Id. § 22-4135(g)(3). Thus, the District of Columbia statute requires a more stringent standard to vacate a conviction but fashions this stronger remedy upon the movant meeting his or her burden of proof. Moreover, "[i]f the conviction resulted from a plea of guilty, and other charges were dismissed as part of a plea agreement, the court shall reinstate any charges of which the defendant has not demonstrated that the defendant is actually *797 innocent." Id. § 22-4135(g)(4). Thus, the District of Columbia statute minimizes unfairness to the government by counterbalancing the movant's interest-vacating a wrongful conviction and ensuring a factually innocent person is not incarcerated-and the government's interest-allowing reinstatement of charges the government otherwise would have pursued if the movant had not pled guilty.
After reviewing the differing standards our sister states have adopted, we find that after pleading guilty, applicants claiming actual innocence must meet the clear and convincing standard. We reach this conclusion for a number of reasons. In House , the United States Supreme Court mentioned the required proof to establish actual innocence as a freestanding claim is greater than that required to establish a gateway claim of actual innocence. 547 U.S. at 555, 126 S.Ct. at 2087 ; accord In re Weber , 284 P.3d at 741 ("[A]ny standard by which a free-standing actual innocence claim must be proved will be higher than that applied in the gateway context.").
In light of House , a clear and convincing standard is the appropriate burden of showing a freestanding claim of actual innocence. This standard is heavier than the more-likely-than-not standard governing gateway claims of actual innocence. It makes sense to have a lower standard for gateway claims because such claims have underlying claims that allege constitutional defects in the trial or plea colloquy. However, an applicant bringing a freestanding claim of actual innocence is claiming he or she is factually and actually innocent, despite a fair, constitutionally compliant trial or plea colloquy free of constitutional defects.
Additionally, a clear and convincing standard balances the interest of an innocent defendant and that of the state. Although the interests of both parties are important, we believe "it is far worse to convict an innocent person than to acquit a guilty one" such that "the scale tips in favor of the [defendant's] interest." Miller , 700 A.2d at 1133. Thus, we simultaneously vindicate this principle and recognize the interest of the state in finality of criminal litigation by adopting a clear and convincing standard.
Finally, the higher burden answers the problems posed by the Colorado Supreme Court regarding claims of newly discovered evidence after a defendant has pled guilty. In People v. Schneider , the court stated,
In the circumstance in which there never was a trial on the charges, the trial court is hampered in that assessment. Furthermore, there must be some consequence attached to the decision to plead guilty. A defendant who voluntarily and knowingly enters a plea accepting responsibility for the charges is properly held to a higher burden in demonstrating to the court that newly discovered evidence should allow him to withdraw that plea.
25 P.3d 755, 761-62 (Colo. 2001) (en banc) (emphasis added). However, by adopting a higher burden of proof-a clear and convincing standard-we account for the differences.
We now adopt the clear and convincing standard to prove a freestanding actual-innocence claim. For an applicant to succeed on a freestanding actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant of the crimes for which the sentencing court found the applicant guilty in light of all the evidence, including the newly discovered evidence.
*798 4. Vehicle to bring freestanding actual-innocence claims. We now address whether our postconviction-relief statute provides a means to raise a freestanding claim of actual innocence. Outside of our current statutory scheme in chapter 822, we need not decide or specify other vehicles applicants may use to bring their freestanding actual-innocence claims as independent actions. We emphasize sections 822(1)(a ) and (d ) are not the exclusive vehicles to bring freestanding actual-innocence claims because applicants may file such claims independently of chapter 822. However, at this point, the legislature has provided the present, appropriate vehicle in chapter 822. The Code provides,
1. Any person who has been convicted of, or sentenced for, a public offense and who claims any of the following may institute, without paying a filing fee, a proceeding under this chapter to secure relief:
a . The conviction or sentence was in violation of the Constitution of the United States or the Constitution or laws of this state.
....
d. There exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice.
Iowa Code § 822.2(1)(a ), (d ).
The Iowa Constitution gives a floor to bring freestanding claims of actual innocence under our postconviction-relief statute, specifically sections 822.2(1)(a ) and (d ). Cf. Washington , 216 Ill.Dec. 773, 665 N.E.2d at 1337 (holding the due process clause of the Illinois Constitution provides a footing to assert freestanding actual-innocence claims based on newly discovered evidence under the Post-Conviction Hearing Act). A conviction of an innocent person violates the Iowa Constitution, specifically the due process clause and the prohibition against infliction of cruel and unusual punishment. Thus, section 822.2(1)(a ) is one vehicle to bring an actual-innocence claim. Additionally, conviction of an innocent person infringes upon the "interest of justice" precisely because it violates the Iowa Constitution. Therefore, section 822.2(1)(d ) is another vehicle to assert an actual-innocence claim.
In sum, we hold subsections 822.2(1)(a ) and (d ) provide avenues for freestanding actual-innocence claims.
IV. Application of Legal Principles.
We first address the statute of limitations issue and then the question of how to proceed under our new standard.
A. Statute of Limitations. Our postconviction-relief statute specifies its own limitations of action. The Iowa Code provides in relevant part,
All ... applications must be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued. However, this limitation does not apply to a ground of fact or law that could not have been raised within the applicable time period.
Iowa Code § 822.3.
Thus, to avoid the three-year statute of limitations contained in section 822.3, an applicant must show he or she could not have raised the ground of fact within the applicable time period. Additionally, "a postconviction-relief applicant relying on the ground-of-fact exception must show the ground of fact is relevant to the challenged conviction." Harrington v. State , 659 N.W.2d 509, 521 (Iowa 2003). This is the nexus requirement. Id. at 520. We made it clear a ground of fact is "relevant" if it is the type of fact "that has the potential to qualify as material evidence *799 for purposes of a substantive claim under section 822.2." Id . at 521.
We explicitly and "specifically reject[ed] any requirement that an applicant must show the ground of fact would likely or probably have changed the outcome of the underlying criminal case in order to avoid a limitations defense." Id . The ultimate determination as to whether the applicant is entitled to relief "must await an adjudication, whether in a summary proceeding or after trial, on the applicant's substantive claim for relief." Id . In other words, we do not reach the merits of a claim based on a new ground of fact in deciding whether the exception to the three-year statute of limitations applies.
Here, B.C.'s recantation was not available to Schmidt within the three-year period following the date of his conviction and Schmidt could not have discovered the recantation earlier than he did in the exercise of due diligence. Additionally, the recantation has the potential to qualify as material evidence that probably would have changed the outcome of Schmidt's case. See id . at 521 (holding the undisclosed police reports and the recantations "are the type of facts having the potential to qualify as material evidence that probably would have changed the outcome of [the defendant's] trial").
We ultimately decided Harrington based on the withheld police reports in order to resolve the due process issue of whether the prosecution suppressed material evidence that was favorable to the defendant. Id. at 521-25. As for the statute-of-limitations analysis, we held both the recantation evidence and the police reports were sufficient; and thus, the defendant was not time barred from bringing his action. Id. at 521.
Based on the foregoing, section 822.3 does not time bar Schmidt's freestanding claim of actual innocence.
B. Application of Standard Regarding Schmidt's Freestanding Actual-Innocence Claim. The district court ruled on Schmidt's case after the State filed a motion for summary dismissal/summary judgment. Section 822.6 allows for a summary disposition. The statute states in relevant part,
The court may grant a motion by either party for summary disposition of the application, when it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.
Iowa Code § 822.6.
At the time the court ruled on the State's motion, it decided the case as a matter of law relying on our jurisprudence that defendants who knowingly and voluntarily plead guilty cannot attack their pleas with challenges extrinsic to the pleas. Today, we have reversed this line of cases and created a new standard for freestanding actual-innocence claims.
Generally, when we create a new standard, we remand the case to the district court to apply the standard. See McQuistion v. City of Clinton , 872 N.W.2d 817, 819-20 (Iowa 2015) (adopting a new standard for the evaluation of a pregnancy claim and remanding the case to the district court to apply that standard); cf. State v. Ary , 877 N.W.2d 686, 707 (Iowa 2016) (remanding the case to the district court to apply the appropriate standard when it initially applied the wrong standard).
Here, we have created a new standard. Thus, the proper result is to remand *800 the case to the district court to apply the standard to the State's motion for summary dismissal/summary judgment. The court should allow the parties to supplement the record, if a party so desires, to provide other evidence or affidavits to support their respective positions. See Iowa R. Civ. P. 1.981(5) (setting forth the methods to present evidence in a summary judgment proceeding).
We are not commenting on the merits of Schmidt's claim. Contrary to the other opinions filed in this case, both parties are entitled to their day in court to litigate their positions under the new standard we have adopted today. We will address any unanswered questions when a party presents the court with actual cases raising those issues. That is how the law progresses in this state. We do not issue advisory opinions. See Linn v. Montgomery , 903 N.W.2d 337, 344 (Iowa 2017).
It is for the district court to determine whether the recantation, in light of any other evidence that meets the requirements of rule 1.981, creates a genuine issue of material fact. We are not in a position to decide the merits of this case by assuming that certain evidence, which may or may not comply with the requirements of rule 1.981, shows there is no genuine issue as to any material fact in order to affirm the summary disposition in favor of the State. Prohibiting the parties here from the benefit of the procedural processes provided to litigants is no better than incarcerating an innocent person.
Only after the parties develop a record in a summary proceeding can the court decide if a genuine issue of material fact exists. If it does, then a trial may be necessary to resolve Schmidt's claim.
V. Disposition.
We vacate the decision of the court of appeals and reverse the judgment of the district court granting the State's motion for summary dismissal/summary judgment. We remand the case to the district court for further proceedings consistent with this opinion.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.
Cady, C.J., Hecht and Appel, JJ., join this opinion. Cady, C.J., files a special concurrence. Waterman, J., files a dissenting opinion in which Mansfield and Zager, JJ., join. Mansfield, J., files a separate dissenting opinion in which Waterman and Zager, JJ., join.
CADY, Chief Justice (concurring specially).
The process of justice must always be fair. This case stands tall as the embodiment of this fundamental principle of law. It is a substantial step forward in our constitutional march to become better. Innocent people should always have a forum to prove their innocence. I fully concur in the opinion of the court.
Yet, the actual process of justice available to Schmidt to now pursue the new claim given to him must also be fair. This fairness is the reason the case must be remanded to the district court for it to decide if summary adjudication should be granted. I write separately only to explain this important part of the case more fully and why the actual-innocence claim cannot now be decided on appeal.
Going forward, when an actual-innocence claim based on the recantation of a witness is brought in our courts, summary judgment will remain a viable procedural vehicle for the state to ask the court to resolve the claim. Consistent with all summary judgment proceedings, the legal issue *801 will be whether the moving party is entitled to summary judgment, under a set of facts assumed to be undisputed for the purposes of the motion, because a reasonable juror could still conclude the defendant is guilty of the crime. For purposes of summary adjudication of witness recantation claims, the undisputed facts needed to support the motion will normally center on the remaining evidence of guilt from other witnesses found in the minutes of testimony. In many cases, the remaining evidence may support summary judgment, as a reasonable juror could still convict the defendant based on the surviving evidence.
In this case, the assumed undisputed facts, at this time, may support summary judgment. In his plea colloquy, Schmidt acknowledged the minutes of testimony were true and accurate. Significantly, the minutes included a witness who was an eyewitness to the assault. With only the recantation evidence offered by Schmidt at this point to prove his innocence, a reasonable fact finder could still conclude Schmidt committed the crime.
Nevertheless, it would be unfair to Schmidt for us to apply the new standard to the existing record to decide the actual-innocence claim now on appeal. At the time the State brought its motion for summary judgment in this case, it argued Schmidt's claim was barred by the three-year statute of limitations under Iowa Code section 822.3 (2014) and the recantation evidence identified in his petition for postconviction relief was discoverable within the limitation period. Thus, at the time Schmidt resisted the summary judgment motion, the legal issue before the court was whether the recantation was discoverable within the three-year period. The district court granted the summary judgment after concluding the exculpatory evidence was extrinsic to the plea and could not be grounds for relief.
Although Schmidt claimed his actual innocence in the summary judgment proceedings, the legal issue he was responding to was whether the recantation evidence was discoverable within the three-year statute of limitations. He was not responding to a substantive claim by the State that his recantation evidence would still be insufficient as a matter to law to support a claim of actual innocence. In fact, recantation as a claim of innocence has still not been teed up by the State, and Schmidt has not been alerted to the requirement to submit all evidence of innocence in direct response to such claim. Thus, the record does not show Schmidt has had a full and fair opportunity to present all new evidence to resist summary judgment.
Likewise, the State has not had a full and fair opportunity to specifically identify its evidence to support summary adjudication under the actual-innocence standard. See Iowa Code § 822.6. Even though the State asked the district court in the summary judgment proceedings to take judicial notice of the complete record in the case, the State must still identify those portions of the record it relies on to support summary judgment. See id.
The case needs to be remanded to the district court so the State can amend its motion for summary judgment to claim Schmidt has failed to bring a claim of actual innocence that survives summary adjudication. The district court needs to consider the motion after Schmidt has filed an amended response. This procedure is required to ensure the process of justice is fair.

We do not think Class v. United States , 583 U.S. ----, 138 S.Ct. 798, 200 L.Ed.2d 37 (2018), affects our decision today. In that case, the United States Supreme Court held a guilty plea does not bar a federal criminal defendant from challenging on direct appeal the constitutionality of the statute of conviction. Id. at ----, 138 S.Ct. at 803-05. Our decision involves an actual-innocence claim under the Iowa Constitution based on newly discovered evidence.

A number of factors contribute to a false confession, such as "duress," "coercion," "intoxication," "diminished capacity," "mental impairment," "ignorance of the law," "fear of violence," "the actual infliction of harm," "the threat of a harsh sentence," [and] "misunderstanding the situation." Innocence Project, False Confessions or Admissions , https://www.innocenceproject.org/causes/false-confessions-admissions/[https://perma.cc/66JM-T4L9].

Two scholars have gone as far to describe the plea bargaining process as "horse trading." Scott & Stuntz, 101 Yale L.J. at 1912.

We acknowledge these two cases involved defendants who went to trial. We discuss this distinction later in the opinion. In any event, we believe the principles reflected in Engesser and In re Kaufmann apply equally to defendants who claim actual innocence following trial and those who claim actual innocence following a guilty plea proceeding.

For example, the following cases involved convictions after trials: Washington , 216 Ill.Dec. 773, 665 N.E.2d at 1331 ; Montoya , 163 P.3d at 478 ; In re Kaufmann , 157 N.E. at 731 ; Engesser , 856 N.W.2d at 473.

We realize this case did not involve an actual-innocence claim but rather a self-defense theory. We think it is nevertheless informative in constructing a standard for freestanding actual-innocence claims in Iowa.