# IN THE COURT OF APPEALS OF IOWA

No. 18-0758
Filed April 15, 2020

**DUSTIN ELLIOT WILLIAMS,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

Dustin Elliot Williams appeals from the denial of his postconviction-relief application. **AFFIRMED.**

Nathan A. Olson of Branstad & Olson Law Office, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee State.

Considered by Vaitheswaran, P.J., Mullins, J., and Potterfield, S.J. Gamble, S.J., takes no part.

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**VAITHESWARAN, Presiding Judge.**

In this appeal from the denial of his postconviction-relief application, Dustin Elliot Williams raises issues relating to the claimed recantation of a key witness in two underlying criminal cases.

In the first case, the State charged Williams with first-degree robbery, a class "B" felony, as well as second-degree theft and possession of a controlled substance (methamphetamine). According to the minutes of testimony, the key witness was slated to testify "she had been in a romantic relationship with [Williams]," and he "came over to her home," "pulled out a gun and pointed it at" her, and "demand[ed] that she give him the keys to her car." The witness was to further testify that once he "had the keys," he "left the residence." She did not "give permission for [him] to take her car or to continue to drive it."

In the second case, the State charged Williams with first-degree robbery. The same key witness was slated to testify that Williams "returned to her home" after learning she filed a police report in connection with the first occurrence, entered the home, pointed "a black 'long barreled' handgun at" her, and "demand[ed] that she give him money." She gave him "roughly $500."

The woman later qualified her initial statements. In the first case, she filed a victim impact statement expressing her belief that Williams "did [not do] this to cause [her] harm or distress" but "was reacting to a fight [they] had." In the second case, she stated she did not feel Williams should have been charged because she "lied to the police."

Approximately seven weeks after the victim impact statements were filed with the court, Williams entered written *Alford* pleas.[1] In the first case, he pled to the aggravated misdemeanor crime of assault with a dangerous weapon and to the misdemeanor crimes of operating a motor vehicle without the owner's consent and possession of methamphetamine. In the second case, he pled to assault with a dangerous weapon.

The district court filed a joint sentencing order adjudging Williams guilty of all four crimes and sentencing him to prison terms not exceeding a total of seven years, to be served consecutively. The court suspended the sentences and placed Williams on probation. Shortly after the sentencing order was filed, the court revoked Williams' probation based on his failure to sign up for probation on his release from jail. The court imposed the indeterminate seven-year sentence.

Williams filed a postconviction-relief application, which was amended to allege the following claims: (1) "[t]rial counsel was ineffective in failing to investigate potential defenses"; (2) "[t]rial counsel was ineffective in specifically failing to investigate and obtain evidence regarding the State's sole eyewitness recanting her initial allegations"; and (3) "trial counsel was ineffective in failing to adequately advise [him] regarding his potential strategies and prospects before a jury, which led to [him] consenting to an *Alford* plea." After a hearing but before a decision was filed, Williams submitted a proposed order, which purported to raise a new free-standing claim of actual innocence based on *Schmidt v. State*, 909

---

[1] *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970) ("An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.").

N.W.2d 778, 781 (Iowa 2018), decided two-and-a-half weeks earlier. As noted, the postconviction court denied the application. This appeal followed.

## I.     *Ineffective Assistance of Counsel*

Williams claims that his trial attorneys denied him effective assistance by "fail[ing] to properly communicate with him," "fail[ing] to inform him regarding a knowing plea," and "fail[ing] to perform to the standards of a reasonably competent attorney when attempting to depose or otherwise obtain testimony regarding the recantation." More specifically, Williams claims that "the failure of defense counsel to obtain a sworn recantation through deposition, diligently pursue a deposition in order to preserve the recantation through testimony, and properly advise [him] of the extent of the recantation statements so [he] could knowingly weigh his plea options, each constituted ineffective assistance." To succeed, Williams was required to prove deficient performance and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). The postconviction court concluded he failed to establish either element. We will focus on the prejudice prong.

To prove prejudice in the plea context, an applicant must demonstrate "a reasonable probability that, but for counsel's errors, he or she would not have pleaded guilty and would have insisted on going to trial." *State v. Petty*, 925 N.W.2d 190, 196 (Iowa 2019) (quoting *State v. Straw*, 709 N.W.2d 128, 138 (Iowa 2006)). Our review of the record is de novo. *State v. Majors*, ___ N.W.2d ___, ___, 2020 WL 1069503, at *9 (Iowa 2020).

At the postconviction-relief hearing, Williams was asked why he entered an *Alford* plea. He responded, "Because I knew it would . . . be harder for me to overturn two 25-year mandatory sentences, and I just felt it would have been

harder. . . . It would have been a difference between them looking at these misdemeanors and the difference than me trying to overturn 25 year sentences." Based on his own testimony, there is no reasonable probability he would have insisted on going to trial.

We reach this conclusion notwithstanding counsel's failure to depose the witness and have her recant under oath. Although Williams testified a deposition would have changed his decision to enter the *Alford* pleas, he acknowledged learning of the recantation well before he pled. He stated, "In the beginning of the case," the woman "came down to the county jail . . . and . . . told [him] . . . that she [was] sorry for what she did by calling the car in," "she was mad because she heard that [he] had another female in the car or that [he] was seeing another female," and "she was going to go down there and tell them the truth." Williams further testified that, the next day, "She came down for another visit . . . and said 'I did wrong, I should have never did that.'"

In addition to learning about the recantation from the witness herself, Williams testified his mother told him about the woman's second thoughts and "the investigator of the . . . juvenile public defender's office" told him the same thing. Notably, Williams discussed the woman's recantation at a pretrial conference held on the day that the woman filed her victim impact statements. He informed the court:

> [T]he week after I was locked up the investigator for the Juvenile Public Defender's Office come spoke to me in the jail. She come spoke to me and said that . . . the alleged victim had . . . called them or came down there . . . and made a statement saying that I did not do the—commit this crime, and that she was mad. That she was mad. It was something she had made up with her and her brother

because she was mad at me. This was from the investigator of the Juvenile Public Defender's Office.

And, at a status hearing before Williams entered his pleas, he stated, "[T]heir alleged victim is stating that I didn't do this, that I didn't commit this crime now." Armed with this knowledge, Williams could have elected to proceed to trial. But, as noted, he understood that the trial option carried the risk of a far harsher sentence.

Both of Williams' attorneys said as much. The attorney who was involved with the plea testified by deposition that, although "it's the client's final decision what they want to do," he was sure he "described to [Williams] that had he been convicted of these [crimes], that even on the short side, . . . if everything is run concurrent, he's looking at robbery first, which is a term not to exceed twenty-five years with a mandatory seventeen years before he's eligible for parole." In the attorney's view, "in terms of what's hanging over his head, there's a lot of risk in going to trial." Williams' second attorney was similarly asked to explain her statement that she "would have strongly urged the Defendant to accept the offer in this case." She responded, "Well, yes. The plea offer being for probation and for misdemeanors, that—I think that's a big enough reduction that I would have felt, and I do feel, that the risk of going to trial is—and what you can lose if a jury for some reason convicted you was too great."

On our de novo review, we conclude there is no reasonable probability Williams would have chosen to go to trial had counsel done everything he charged them with not doing.

## II.     *Actual Innocence*

As noted, Williams argues he is actually innocent. The State preliminarily responds that error was not preserved because "Williams did not mention [the opinion recognizing a free-standing claim of actual innocence] until he filed his post-hearing proposed order and, even then, . . . Williams did not raise a free-standing claim of actual innocence."

Williams raised the claim, albeit belatedly, and the postconviction court addressed it on the merits.  Accordingly, error was preserved.  *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("Where the trial court's ruling, as here, expressly acknowledges that an issue is before the court and then the ruling necessarily decides that issue, that is sufficient to preserve error.").

We turn to the vehicle for raising an actual-innocence claim.  The State asks us to limit the vehicle to postconviction actions alleging actual innocence based on newly-discovered evidence.  *See* Iowa Code § 822.2(1)(d) (2016).  To do so would contravene *Schmidt*, which held "subsections 822.2(1)(a) [authorizing claims alleging a conviction or sentence was in violation of the Constitution of the United States or the Constitution or laws of this state'] and (d) provide avenues for freestanding actual-innocence claims."  *Schmidt*, 909 N.W.2d at 798.  The court also implied there might be other vehicles for raising the claim.  *Id.* ("Outside of our current statutory scheme in chapter 822, we need not decide or specify other vehicles applicants may use to bring their freestanding actual-innocence claims as independent actions.").  In light of the court's holding, we decline to conclude that a free-standing claim of actual innocence must be premised on newly-discovered

evidence and we further decline to conclude Williams' claim fails because he did not proffer newly-discovered evidence. We turn to the merits of his claim.

"For an applicant to succeed on a freestanding actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant of the crimes for which the sentencing court found the applicant guilty in light of all the evidence, including [any] newly discovered evidence." *Id.* at 797.

In his post-hearing proposed ruling, Williams asserted that he had "consistently maintained his innocence" and his "innocence [was] corroborated by testimony and exhibits in this case." On appeal, he contends, "Based on [the woman's] recantations of allegations that would support the robbery or assault with a dangerous weapon charges, and based upon consideration of all the evidence in the record, clear and convincing evidence exists to show that a reasonable fact finder would not convict [him] of either of two counts of robbery first, or two counts of assault with a dangerous weapon."

We find it unnecessary to address the first-degree robbery charges because Williams did not plead to those crimes. We will focus on the two counts of assault with a dangerous weapon to which he entered *Alford* pleas.

As the State points out, the supreme court has "repeatedly held that a witness' recantation testimony . . . is looked upon with the utmost suspicion." *Jones v. State*, 479 N.W.2d 265, 275 (Iowa 1991).[2] That principle, together with

---

[2] In *Hoskins v. State*, No. 19-0035, 2020 WL 1310308, at *5 n.1 (Iowa Ct. App. Mar. 18, 2020), this court "considered whether the holding in [*State v. Jones*, 271 N.W.2d 761, 763 (Iowa 1978)] was undermined by the supreme court's holding in

the woman's postconviction deposition testimony acknowledging Williams "had [her] car" and she had a black eye[3] lead us to agree with the district court that Williams failed to carry his heavy burden of proving that no reasonable fact finder could convict him of assault with a dangerous weapon. *See Allison v. State*, 914 N.W.2d 866, 890 (Iowa 2018) ("A person convicted of a crime seeking relief through asserting actual innocence carries a heavy burden, and such a claim is available to correct only the most egregious miscarriages of justice.").

We affirm the denial of Williams' postconviction-relief application.

**AFFIRMED.**

---

*Schmidt v. State*, 909 N.W.2d 778, 781 (Iowa 2018)." We stated, "We do not believe it was."

[3] The woman testified she got it "[h]orsing around at [her] mom's."