# IN THE COURT OF APPEALS OF IOWA

No. 23-1030
Filed November 13, 2024

**JASON MATHEW CURTIS,**
         Applicant-Appellee/Cross-Appellant,

**vs.**

**STATE OF IOWA,**
         Respondent-Appellant/Cross-Appellee.
_____

         Appeal from the Iowa District Court for Pottawattamie County, Terry Rickers, Judge.

         The State appeals and the applicant cross-appeals the district court's ruling on postconviction relief. **REVERSED AND REMANDED WITH DIRECTIONS ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

         Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellant/cross-appellee.

         Tricia J. Bushnell of Midwest Innocence Project, Kansas City, Missouri, John C. Aisenbrey (pro hac vice) and Ashley M. Crisafulli (pro hac vice) of Stinson LLP, Kansas City, Missouri, for appellee/cross-appellant.

         Heard by Greer, P.J., and Ahlers and Badding, JJ

**BADDING, Judge.**

Jason Curtis was convicted of first-degree murder for the death of his infant son, five-month-old J.C.  He applied for postconviction relief, arguing:

> The jury never heard the truth of what happened on the morning of July 14, 2011—that [J.C.], a sickly infant, finally succumbed to the interstitial pneumonia that ravaged his lungs.

Through that lens, Curtis raised claims of actual innocence, ineffective assistance of counsel, and violation of his due process rights because of prosecutorial misconduct.  Interspersed in these claims was the arrest of the infant's pediatrician shortly after Curtis's trial on a federal charge of possession of child pornography and allegations that defense counsel was intoxicated at trial.

After a four-day hearing on Curtis's postconviction-relief application—with testimony from expert witnesses, extensive briefing from the parties, and thousands of pages of exhibits—the district court rejected the actual-innocence and due-process claims in a thorough forty-nine page ruling but granted a new trial on the claim that counsel was ineffective in advising Curtis about his right to testify.

The State appeals the court's finding that counsel was ineffective, while Curtis cross-appeals the rejection of his actual-innocence and due-process claims.

I.      **Background Facts and Proceedings**

J.C. was born on February 11, 2011, and died on July 14, 2011.  His parents were Curtis and Chrissy Vyborny.  On the morning of J.C.'s death, Vyborny had to work at 6:00 a.m.  While she was getting ready, she saw J.C. was waking up.  Vyborny picked him up—"[a]nd he was stretching and he smiled" at her.  She took J.C. into the living room, where Curtis was sleeping on the couch, and put him on

the floor next to Curtis. She told Curtis that J.C. was awake and left for work, running a little behind.

Shortly after 11:04 a.m., Curtis called 911 and reported, "My son is not breathing right, and I don't know if he's breathing at all." Curtis said that he had tried to do CPR on him and that he "still has a heartbeat and stuff, but he's just not breathing." When the dispatcher asked, "He has a heartbeat, but he's not breathing?" Curtis answered, "Correct." Emergency medical personnel and other first responders arrived at the home in a matter of minutes, where they found J.C. lying on a play mat on the living room floor.

The first responders observed that J.C. was already "cool to the touch," but they initiated CPR. While J.C. was being tended to, Curtis told police chief Eric Johansen that J.C. had been "taking a nap and he went to check on him and found him that way." Curtis also reported that J.C. had been sick, and his doctor recently put him on some medicine that "Curtis had some concerns about." Curtis then called Vyborny at work and told her that she needed to come home because something was wrong with J.C. Once Vyborny got home, she and Curtis drove to the hospital together. On the way there, Vyborny asked Curtis what happened, and Curtis reported that "he didn't know, that he fed him, laid him down for a nap and when he went to check on him, he didn't know if he was not breathing or barely breathing."

J.C. arrived at the hospital by ambulance at about 11:40 a.m., but lifesaving efforts were futile. He was pronounced dead at 11:44 a.m. J.C.'s pediatrician, Dr. Dennis Jones, testified that he spoke with Curtis and Vyborny at the hospital. According to Dr. Jones, Curtis told him that J.C. "was on the floor and was playing

and acting fine and didn't have any concerns about him."  He didn't recall Curtis saying that he had laid J.C. down for a nap.

Chief Johansen contacted the Iowa Division of Criminal Investigation for assistance with the investigation.  Special Agent Daniel Dawson was assigned to the case and interviewed Curtis at the hospital.  Expanding on what he had said to Chief Johansen, Curtis told Agent Dawson that J.C. had been "having some medical issues the last few days."  They had taken him to see Dr. Jones because he "wasn't breathing right," was "hacking and coughing," and "sneezing up and there was a lot of discharge when he was doing that."  Curtis said Dr. Jones told them that J.C. had an upper respiratory infection that would have to run its course, as well as a cold.  Dr. Jones prescribed a medication that J.C. had been on before and "had a really negative effect on him"—he wasn't eating, was losing weight, was lethargic, and was not himself.  According to Curtis, J.C. seemed worse after he got home from the appointment with Dr. Jones.  Curtis also said the medication "has a list of side effects as long as my arm," and it's not something that should be given to a child.  Curtis reported that on the day J.C. died, he gave the infant a dose of the medicine, fed him, and then laid him down.

Emergency room physician, Dr. Patrick Costello, physically examined J.C.  His rectal temperature measured at 88.9 degrees Fahrenheit, and Dr. Costello thought he "appeared to be . . . deceased for some time before he arrived."  Dr. Costello did not observe any trauma or deformity to J.C.'s head, although he did see retinal hemorrhages in both of J.C.'s eyes.  At the request of law enforcement, Dr. Costello ordered a CT scan of the head and a skeletal survey—

essentially an x-ray of the entire body that can show any soft tissue swelling or broken bones.

Dr. Douglas Niemann was the radiologist who read the CT scan and skeletal survey. While there were no fractures to the skull, Dr. Niemann did observe acute hemorrhaging—meaning bleeding—to the brain, which would be aged "three days or less," and fluid on the brain consistent with subacute hemorrhaging, which would have been more than three days old. Dr. Niemann also noted mild swelling of J.C.'s brain. After Agent Dawson received the radiology results at around 3:00 p.m., he assumed the role as lead investigator in the death investigation and attended the autopsy the next day.

Deputy State Medical Examiner Dr. Dennis Klein conducted that autopsy of J.C. and engaged experts on neuropathology and ophthalmology to assist. After considering the results of their examinations, along with his own, Dr. Klein opined J.C.'s cause of death was head injuries, with the manner of death being homicide.

Curtis was arrested in October 2011. The matter proceeded to trial over several days in early 2013 on charges of first-degree murder and child endangerment resulting in death. Most of the evidence at trial focused on the parties' competing expert opinions on the cause and manner of death, with the State's theory being that J.C. suffered non-accidental abusive head trauma while in Curtis's sole care, and the defense presenting various differential diagnoses to explain J.C.'s death. Curtis did not testify, and no colloquy was conducted

concerning his decision. In the end, the jury found Curtis guilty as charged. The court merged the convictions and sentenced Curtis to life in prison.[1]

Curtis applied for postconviction relief in 2015. In an amended application filed in 2020, Curtis argued, among other things, that (1) "[t]rial counsel was ineffective for failing to prepare [him] to testify despite his request to do so, and for failing to advise him on the consequences of not testifying"; (2) the prosecutor violated his right to due process by making knowingly false statements in closing argument; (3) there was new evidence that Dr. Jones was imprisoned for possessing child pornography;[2] and (4) he is actually innocent because J.C. "died of natural causes as a result of his acute respiratory illness and other ailments." Curtis expanded on these claims in a later amended application and briefing before and after the hearing on his claims.

The district court rejected all but the first of these claims, finding that Curtis's lead defense attorney, Michael Williams, "failed to sufficiently discuss with [Curtis] his fundamental right to testify," which was a breach of duty. On the prejudice prong, the court reasoned that if Curtis had testified, "he could have offered his side of the story and could have rebutted any of the inaccuracies he claimed were part of the State's narrative and argument in the case." Because it granted relief on that claim, the court declined to address the other ineffective-assistance

---

[1] On direct appeal, Curtis raised three claims of ineffective assistance of counsel, which we preserved for postconviction relief. *See State v. Curtis*, No. 13-0620, 2024 WL 3747828, at *1 (Iowa Ct. App. July 30, 2014).

[2] While this is the correct name for Dr. Jones's federal criminal charge, at least one federal court has stated "that child pornography is more appropriately called 'Child Sexual Abuse Material.'" *See State v. Ruden*, No. 23-0171, 2024 WL 3887138, at *3 n.3 (Iowa Ct. App. Aug. 21, 2024) (citing *United States v. Larson*, No. 5:19-CR-50165-RAL, 2023 WL 196171, at *1 n.1 (D.S.D. Jan. 17, 2023)).

claims.[3]  As for Curtis's actual-innocence claim, after reviewing all the evidence before it, the court concluded that "it cannot be shown by clear and convincing evidence that no reasonable fact finder could convict [Curtis] of the crimes for which he was sentenced."  And on the due process violation, the court found the prosecutor's challenged statements "did not deny [Curtis] a fair trial or violate his due process rights."

The State filed a motion to reconsider, enlarge, or amend, which Curtis resisted.  The court granted the motion in part by removing a reference to a juror's statement about the lack of Curtis's testimony in its prejudice analysis, *see* Iowa R. Evid. 5.606(b)(1), and adding testimony from Curtis's aunts about their belief that Williams was intoxicated at trial and his later dismissal from the public defender's office.  The State appeals, and Curtis cross-appeals.

## II.      Standard of Review

Although we normally review rulings on postconviction relief for errors at law, when the proceedings raise constitutional infirmities—as they do here—our review is de novo.  *See Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021).

---

[3] Those other claims included assertions that defense counsel was ineffective for failing to (1) investigate and retain a pediatric clinician to testify at trial; (2) investigate and call lay witnesses who could testify to Curtis's parenting skills; (3) meaningfully associate with an expert on "abusive head trauma cases and to complete recommended tasks and consult with recommended medical experts"; (4) object to the prosecutor's arguments that Curtis provided a "false history"; (5) object to portions of a recorded interview where Curtis considered invoking his right to remain silent; (6) maintain confidentiality of client information by forwarding correspondence with a potential expert to the prosecutor; (7) object to the prosecutor's improper argument that the State had proven by a preponderance of the evidence that the "chronic hemorrhages on [J.C.'s] brain were the cause of [his] failure to thrive hospitalization and implying they were caused by abuse"; and (8) object to improper and prejudicial voir dire.

### III.     State's Appeal—Failure to Testify

To establish his claim of ineffective assistance, Curtis was required to prove (1) his counsel failed to perform an essential duty and (2) prejudice resulted.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018).  If Curtis failed to meet his burden for either, then he is not entitled to relief.  *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017).

The State challenges both prongs, contending the court erred in granting Curtis relief because (1) Williams "told Curtis that he had a right to testify and a right to choose whether to testify"; (2) Williams made a strategic decision to not request a colloquy on Curtis's decision; (3) even without a colloquy, the record "shows that Curtis made a knowing, voluntary, and intelligent decision not to testify"; (4) the advice not to testify was reasonable; (5) allegations that Williams was intoxicated at trial were not credible; and (6) Curtis failed to show prejudice.  In response, Curtis argues that the court "correctly concluded that trial counsel's complete lack of investigation into what [Curtis] would testify to constituted deficient performance."  Because of this failure, Curtis asserts "the State's 'false history' version of events on the day of [J.C.'s] death went unchallenged, and the jury never heard from [Curtis], the only adult witness present during the five hours leading up to [J.C.'s] death, about what transpired that day."

As our supreme court explained in *Ledezma v. State*,

> A defendant has a constitutional right to testify at a criminal trial.  Moreover, it is a fundamental right that can only be waived by the defendant, which can only be done voluntarily, knowingly, and intelligently.  The decision whether or not to testify belongs to the defendant, and the role of counsel is to provide advice to enable a defendant to make the decision.

626 N.W.2d 134, 146 (Iowa 2001) (internal citations omitted). In concluding that Williams breached an essential duty by failing "to sufficiently discuss with [Curtis] his fundamental right to testify," the court first found that "Williams never actually heard from [Curtis] himself that he did not want to testify." But that's not what the record shows.

At Curtis's postconviction-relief hearing, Williams testified that he was certain he would have spoken to Curtis about testifying "sometime prior to trial," explaining: "I want to make sure that every client understands that important right." When asked, "do you know what you told him?" Williams responded:

> I told him that it was his right to choose, and I believe that we went over what the issues were and, again, going back to the pros and cons. It would be his chance to be able to speak to the jury. Sometimes that's very helpful. Sometimes people get mixed up. They get nervous. They come across as lying. And there was one other issue that I wanted to avoid if at all possible.

That issue was a child endangerment charge involving Curtis and Vyborny's other child, L1.

In November 2010—less than a year before J.C. died—Curtis pled guilty to child endangerment resulting in serious injury after L1's arm and clavicle were broken when she was four months old. He was granted a deferred judgment and placed on probation for two years. While representing Curtis on the criminal charges for J.C.'s death, Williams helped him vacate the guilty plea in L1's case, and the matter was reset for trial. In an email to Curtis about L1's case, Williams explained his strategy in vacating the guilty plea: "We want to have you be able to withdraw your plea and thus erase the 'conviction' so that the conviction could

never be used against you to impeach your credibility *in the event that you testify*." (Emphasis added.)

Still, Williams was concerned the incident would be used at trial, as he explained in another email to Curtis: "it is important for you to know that even without your plea of guilty to any abuse against her, the State can attempt to introduce the evidence of the alleged abuse in the trial concerning [J.C.]" Williams eventually secured an agreement from the State "that the allegations of prior abuse" involving L1 would "not be mentioned during the trial unless the door is somehow opened."[4]  But he testified at the postconviction-relief hearing that "all [Curtis] had to do was once slip in 'I'm a good dad.  I'm a careful dad that would never hurt my children.  I would never hurt anyone.'  Anything like that made me fearful that he could do that very, very easily because he wants to defend himself." Based on those discussions, it was Williams's best recollection at the postconviction-relief hearing that Curtis decided not to testify before trial.  Williams had his co-counsel, Greg Jones, confirm that decision during the trial before the defense rested its case.

Curtis agreed in his testimony at the hearing that Williams talked to him before trial about whether he would testify, although Curtis claimed Williams told him that his testimony wouldn't be beneficial and never asked him what he might say.  But shortly after he was appointed, Williams solicited and received Curtis's

---

[4] Williams also succeeded in keeping out evidence that Curtis's older daughter from a different relationship, five-year-old L2, told a babysitter that "Daddy got mad" when J.C. wouldn't take his bottle and "grabbed him by the shirt and picked him up and carried him like that."  L2 was not present the day J.C. died, but a couple of days later, Curtis told L2's mother to not let L2 talk to anybody.

side of the story while gathering information for a potential expert witness. Williams also had notes from the defense investigator detailing the investigator's interview with Curtis, along with a timeline that Curtis himself prepared. So the record shows Williams had talked to Curtis about testifying, and he had an idea of what Curtis would have to say. *Cf. id.* at 147 (finding trial counsel advised client against testifying "without gathering all the necessary facts"). Yet the court found that because Jones, who Curtis met for the first time at trial, had the final discussion with Curtis about testifying, Williams performed deficiently. We disagree.

About three months after Curtis was arrested, he contacted Heather Kirkwood—an attorney from Seattle who specialized in child abuse cases with abusive head trauma—because his first court-appointed attorney had limited experience with those types of cases. She provided Curtis with help from afar, putting him in touch with potential expert witnesses, organizing medical records, and preparing a timeline. Curtis maintained contact with Kirkwood as his case progressed, often talking to her "[a]t length" by phone. The evening before the defense rested, Curtis contacted Kirkwood about testifying. She confirmed their conversation in an email the next day, writing Curtis:

> Last night you told me that *your lawyers* asked if you wanted to testify and that it was your right to choose. You asked if *they* would prepare you, and *they* said *they* don't do that because *they* don't want the witnesses to seem rehearsed. Did I understand that correctly?

(Emphasis added.) Curtis replied, "That is all correct information." This email confirms that *both* Williams and Jones talked to Curtis about his right to testify, as does an email from Jones to Curtis after the defense rested and court adjourned for the day:

> Jason, I wanted to confirm the conversation we had this morning about whether or not you would testify in your trial. I advised you not to testify for several reasons. They include:
>
> 1. The jury had already heard you say you did not do it in both the 911 call as well as in the interview with the DCI agent.
>
> 2. *We* were concerned about putting your credibility in question. It would be a simple matter to bring in the prior abuse allegation against you. That would be fatal to your case.
>
> 3. The difficult cross examination *we* anticipated the State would subject you to.
>
> You told me that as long as certain things were in evidence, you would not testify. We talked about those things, and they were either already in evidence or would be brought out by Dr. Squier. After Dr. Squier testified you reaffirmed your decision not to testify to me orally. I then told Mike who formally rested your defense without your testimony.

(Emphasis added.) Based on these emails—and testimony from Williams and Curtis at the postconviction-relief hearing—we conclude the district court was incorrect in finding that "Williams never actually heard from [Curtis] himself that he did not want to testify."

From there, the court faulted Williams for not preparing Curtis to testify because he does not like defendant testimony to sound rehearsed. But at the postconviction-relief hearing, Curtis did not tie his decision to Williams's failure to prepare him. Instead, Curtis maintained that he did not testify because his attorneys advised against it, and he did not know that he could "overrule them." The emails set out above establish that Curtis did understand that "it was [his] right to choose." And the record shows Williams's main advice against testifying was based on his concern that Curtis's testimony would open the door to the prior abuse allegation and on Williams's belief that what the experts "say in this case is the key." Indeed, in an affidavit from Kirkwood that was admitted as an exhibit at the postconviction-relief hearing, she notes that in the days before the defense

rested, Curtis informed her "that he was told by both Mike and Greg (his attorneys) that he didn't need to testify as he would have nothing to add to the medical aspect of things."

"[A]n ineffective assistance of counsel claim generally does not lie for the exercise of judgment" so long as it's reasonable. *State v. Polly*, 657 N.W.2d 462, 468 (Iowa 2003). Declining to call a particular witness, even a defendant, "implicates a reasonable tactical decision." *Id.* And "'[i]mprovident trial strategy or miscalculated tactics' typically do not constitute ineffective assistance of counsel." *Id.* (citation omitted). The risk of Curtis opening the door to the prior abuse allegation, where the main battle at trial was the expert evidence, gave Williams "'a sound tactical reason' to not 'roll the dice'" by having Curtis testify. *Lewis v. State*, No. 22-2000, 2024 WL 1295571, at *3 (Iowa Ct. App. Mar. 27, 2024) (citation omitted).

Next, the district court found deficient performance because Curtis was not advised of the consequence of not testifying—"that there were no other witnesses besides [him] that could not only support the defense's theory of events and experts, but also contradict the State's theory of events and experts." *See Ledezma*, 626 N.W.2d at 148 (finding deficient performance in a case that "essentially came down to the credibility of one of two stories" where counsel did not explain that if the defendant did not testify, there would be no witnesses to challenge the victim's testimony). This ignores the defense's expert witnesses, who presented the jury with Curtis's differential-diagnoses defense. And, as discussed, Williams spoke to Curtis about testifying before and during the trial, and Jones followed up to see if Curtis changed his mind. *See State v. Reynolds*, 670

N.W.2d 405, 411 (Iowa 2003) ("Trial counsel's role is simply to provide advice to the defendant to enable the accused to make a well-informed decision."). The consequences of Curtis not testifying were clear.

The district court also found the absence of a written statement or colloquy about Curtis's decision not to testify weighed in favor of finding deficient performance. Williams explained this was intentional because he did not want to prevent his client from bringing a postconviction-relief claim based on the failure to testify, which is exactly what Curtis did here. This court has ruled, albeit in passing, that counsel has no duty to secure a defendant's waiver to testify on the record—though it is certainly better practice to do so. *See Cole v. State*, No. 22-1046, 2023 WL 3613274, at *3 n.2 (Iowa Ct. App. May 24, 2023).

Last, the court was convinced that Williams was under the influence during trial and therefore "was not providing competent advice." At the postconviction-relief hearing, Curtis's aunts testified that Williams smelled like alcohol during the trial. And several years after Curtis was convicted, Williams left the public defender's office because, as he explained at the postconviction-relief hearing, "there was an alcohol problem that I failed to address in a timely manner, and I had consumed some alcohol at the office." Williams denied drinking during "working hours" while Curtis's trial was underway. The trial transcript shows that Williams skillfully examined and cross-examined multiple expert witnesses for days about dense and complicated medical topics, with no indication that he was intoxicated. Nor did anyone raise any concerns during the trial, which lasted more than one week. As the State points out, such a "scandalous" circumstance would "have been noticed by Curtis, the judge, the prosecutors, and Jones (who was also

Williams's direct supervisor)." It was only Curtis's aunts who alleged they saw something. But neither mentioned it until years later—and after Curtis gained access to Williams's personnel file.

In light of all these circumstances, *see Ledezma*, 626 N.W.2d at 143, we find that the district court erred in concluding Williams performed deficiently in advising Curtis about his right to testify. Because Curtis failed to prove that prong, we reverse the court's decision granting relief on this claim and remand for the court to address Curtis's remaining ineffective-assistance claims on the record already made.

## IV. Cross-Appeal

### A. Actual Innocence

On cross-appeal, Curtis claims the district court erred in concluding he did not establish his claim of actual innocence. He first argues the court applied the wrong test to his claim of actual innocence—one of "newly discovered evidence," rather than "newly presented evidence." Under the correct standard, Curtis maintains that he established his actual innocence.

Starting with the standard, in *Schmidt v. State*, our supreme court stated:

> For an applicant to succeed on a freestanding actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant of the crimes for which the sentencing court found the applicant guilty in light of all the evidence, including the newly discovered evidence.

909 N.W.2d 778, 797 (Iowa 2018).[5]  This standard is demanding.  *See Dewberry v. State*, 941 N.W.2d 1, 5 (Iowa 2019).  Such a claim requires "factual innocence, not mere legal insufficiency."  *Id.* at 7 (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).  The establishment of such claims is "extremely rare."  *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 321 (1995)).

In ruling on Curtis's claim of actual innocence, the district court quoted the above passage from *Schmidt* in its entirety.  The court then surveyed all the expert evidence at the criminal trial and on postconviction relief.  After doing so, the court concluded that the new postconviction-relief evidence was similar to the expert evidence Curtis presented at the criminal trial, and it was up for the jury to decide who won the battle of the experts.  Curtis contends the district court incorrectly applied the actual-innocence standard by limiting what it considered to be new evidence and viewing pieces of evidence in isolation.  But the court answered the overall question—whether a reasonable jury could have convicted Curtis in light of all the evidence, including the newly presented evidence.  So we reject Curtis's complaints about the court's application of the test.

Moving on to the merits of Curtis's claim, he argues that the totality of evidence shows J.C. was never healthy and suffered cardiac arrest caused by pneumonia, Dr. Jones's subsequent conviction undermined his testimony at the

---

[5] The State does not challenge Curtis's assertion that a freestanding claim of actual innocence does not have to fit within the newly-discovered-evidence framework. So we will assume without deciding that assertion is correct.  *See Concepcion v. State*, No. 19-0530, 2021 WL 811164, at *3 n.1 (Iowa Ct. App. Mar. 3, 2021) (noting that in *Schmidt*, the court emphasized that Iowa Code section 822.2(1)(a) and (d) "providing relief for constitutional violations and for newly discovered evidence, are 'not the exclusive vehicles to bring freestanding actual-innocence claims'" (quoting *Schmidt*, 909 N.W.2d at 798)).

criminal trial, and Curtis was an attentive and loving father. Based on this evidence, Curtis maintains no reasonable fact finder could have found him guilty. We agree with the district court upon our de novo review of all the evidence that Curtis did not meet that heavy burden.

Looking back at the evidence presented at Curtis's criminal trial, the jury heard from J.C.'s pediatrician, Dr. Jones, about his general medical condition from birth until death. Most significant was J.C.'s hospitalization on May 16, 2011, for failure to thrive. During his three-day hospitalization, J.C. gained one pound, and his demeanor returned to normal. He was discharged into his parents' care with a plan for frequent weight checks. Those weight checks were satisfactory. But towards the end of June and into July, J.C. had a low-grade fever, cough, and runny nose. He had similar symptoms in May, along with concerns for diarrhea and thrush. Dr. Jones changed J.C.'s formula in June and prescribed an antibiotic on July 11. Other than a cough and runny nose, J.C.'s babysitters testified that he seemed normal the next two days. Vyborny agreed that J.C. seemed fine the night before he died and that morning when he woke up.

Dr. Klein, who performed J.C.'s autopsy, did not detect any developmental or anatomical abnormalities that could have resulted in J.C.'s death. On examination of the lungs, biopsies did show "the very early stages of pneumonia." However, Dr. Klein opined "it was not a severe pneumonia and would not likely have been a cause of death, . . . but may have presented . . . as having a cold." While J.C. did not have any skull fractures or external evidence of trauma, Dr. Klein found hemorrhaging into the fatty tissue underneath the skin of the scalp; subgaleal hemorrhaging just over the skull; subdural hemorrhaging of various

ages; subarachnoid hemorrhaging just underneath the covering of the brain not indicative of arterial issues; brain swelling; and a hypoxic/ischemic injury consistent with lack of blood and oxygen to the brain.

Dr. Klein engaged two experts to assist in his examination of J.C.—Dr. Patricia Kirby, a neuropathologist, and Dr. Nasreen Syed, a professor of ophthalmology and pathology. Dr. Kirby autopsied J.C.'s brain and spinal cord. She found "multiple subdural hemorrhages over both the cerebral hemispheres in the subdural space. Most on the right-hand side but they're extensive and they were bilateral on both sides." She testified the extensive focal hemorrhaging was non-adherent, meaning acute and occurring within hours or "a couple of days." A microscopic examination of the subdural area showed older hemorrhaging underneath that "were some weeks or months old." Dr. Kirby also observed that the brain itself was swollen, and there was a blood clot between the two cerebral hemispheres. Dr. Kirby found acute subarachnoid hemorrhaging to the base and stem of the brain and the thoracic area of the spinal cord. Like Dr. Klein, she did not find any developmental abnormalities, vascular malformations, aneurysms, tumors, or viruses that would have explained these findings. Dr. Kirby also testified that receiving CPR or taking antibiotics would not have caused any of her findings. But she was hesitant to say that J.C.'s hemorrhages resulted from trauma because she "would want to know a lot more information."

Dr. Syed, however, linked the totality of what she found in her examination of the eyes to trauma. Her autopsy showed hemorrhaging to the surface of the dura, the optic nerve sheath, and retina. Dr. Syed explained the volume and peripheral nature of the retinal hemorrhaging suggested it was caused by

something more than swelling of the brain. She also found a circumferential fold of the retina in the right eye, which "suggests some sort of severe traumatic injury has occurred in this location."

Finally, Dr. Suzanne Haney, a child abuse pediatrician, concluded that J.C. died from abusive head trauma (formerly known as "shaken baby syndrome") after reviewing all his medical records from birth through death and the autopsy report. She did not believe that hemorrhaging or rebleeding was the cause of death, testifying that the injury to J.C.'s brain was instead caused by a "severe rotational injury."

Curtis's experts at trial and on postconviction relief challenged these findings, and the State's abusive-head-trauma theory, with differential diagnoses to explain J.C.'s death. The first of those experts at Curtis's criminal trial was forensic pathologist, Dr. Peter Stephens. He testified that J.C. died of a chronic subdural hematoma, which he described as "a condition in which an acute subdural hematoma or a bleed into the membranes lining the brain fails to heal" and "is characterized by periodic bleeding . . . and stopping of bleeding that goes on for a period of months, if not years, progressively damaging the brain as that happens." Every time a rebleed occurs, according to Dr. Stephens, "there is a possibility that the brain function will cease." He described J.C. as "clearly a very sick child" with "multiple medical problems that . . . may or may not have had a bearing" on how he died. Dr. Stephens attributed any signs that were pegged as trauma-related by the State as postmortem lividity (pooling of the blood after death), decomposition, or pressure sores. He testified there was no inflammation to the skin, and he saw "no evidence of an inflicted trauma" to the back of the head.

But on cross-examination, Dr. Stephens agreed inflicted trauma is a potential—and the most common—cause of acute subdural hemorrhaging, which J.C. exhibited.

Ophthalmologist Dr. Horace Gardner, who did not specialize in pediatrics or child abuse, thought J.C.'s retinal hemorrhages were natural and spontaneous. Dr. Gardner testified there are more than 100 causes for retinal hemorrhages, including pressure in the cranium, which can also result in hemorrhaging to the optic nerve sheath. He criticized Dr. Syed's autopsy of J.C.'s eyes because she removed the vitreous jelly and destroyed its potential use as evidence. In any event, he claimed the photographs she took did not show a perimacular fold, and he opined "there's nothing in the eye that says abuse." But, on cross, he agreed that retinal hemorrhaging occurs in 85% of inflicted trauma cases, while severe accidental head trauma is infrequently accompanied by such hemorrhaging.

Finally, Curtis's best trial witness—Oxford University neuropathologist Dr. Waney Squier—testified that she didn't know what caused J.C.'s death. She saw no "unequivocal evidence of trauma" and testified that J.C. was a medically vulnerable child, which heightened his susceptibility to whatever caused his demise. Dr. Squier explained J.C.'s health issues included that he required antibiotics shortly after birth, had thrush twice, showed signs of a respiratory issue, was hospitalized for failure to thrive, showed symptoms of neurological issues, had ear infections, and then was on more antibiotics just before he died. She testified the antibiotics could have affected J.C.'s blood-clotting abilities, which could have contributed to the hemorrhaging. She also thought the CPR efforts could have caused both dural and retinal hemorrhaging because it would pump blood

backwards into the brain. While Dr. Squier couldn't pinpoint any specific cause of death, she opined the preexisting subdural hemorrhaging—which she believed related to birth—could have caused a seizure resulting in death. Alternatively, she thought J.C. could have had a heart attack or suffered from sepsis.

On postconviction relief, Curtis's witnesses presented a more unified front, although not consistent with his experts at trial. Pediatrician Dr. Peter Dehnel surveyed J.C.'s health problems and opined there were no signs of abuse. Unlike Curtis's experts at the criminal trial, Dr. Dehnel testified J.C. suffered from "undefined neurologic abnormalities" that could have increased his susceptibility to pneumonia, which he had symptoms of before his untimely death. Those abnormalities included symptoms from J.C.'s failure-to-thrive admission: his persistent leaning of his head to the left, the flattened back of his head on the left side, "very large head" with poor muscle tone, inability to suck and swallow for feeding, his poor eye control, and his high-pitched cry, which he said that Dr. Jones did not adequately address.

Neuropathologist Dr. Roland Auer built on Dr. Dehnel's opinion by testifying that a chronic chest infection caused J.C.'s heart to stop, which resulted in brain death due to lack of blood flow to the brain. According to Dr. Auer, the brain and retinal bleeding resulted from resuscitation attempts. He also concluded there was no circumferential perimacular fold to J.C.'s eyes, and he found no evidence of physical trauma or a head injury. Instead, Dr. Auer testified J.C. "was sick from birth."

Dr. Janice Ophoven, a forensic, anatomic, and pediatric pathologist, similarly testified that J.C. "was not a healthy baby." While she couldn't determine

the specific cause of his death, she believed that J.C. suffered a respiratory cardiac arrest that led to his death. Dr. Ophoven testified the dural and optic hemorrhaging predated death and any brain swelling was minimal and consistent with a child who suffered cardiac arrest in resuscitation. Of the acute subdural and retinal hemorrhaging, Dr. Ophoven believed that it was from reperfusion bleeding into tissue from prolonged resuscitation.

Lung expert Dr. Francis Green generally opined that J.C.'s subpar lung function from chronic interstitial pneumonia resulted in cardiac arrest and then brain death. Along with the pneumonia, Dr. Green saw what he thought was both short- and long-term aspirated formula in J.C.'s lungs, which would also tend to block the flow of oxygen. Dr. Green testified neurological problems would affect the reflex that prevents aspiration of matter from the mouth or stomach into the lungs.

These experts' opinions, however, were inconsistent with the testimony of Curtis's trial experts. For instance, at Curtis's criminal trial, Dr. Stephens testified that it "would be totally incorrect to say that [J.C.] died of cardiac arrest" because that "was secondary to the brain problem." While Dr. Squier did not foreclose the possibility of cardiac arrest, she testified there would be no evidence of that because the "baby died far too quickly, so we won't see damage in the heart." And although Dr. Squier noted "there was a suspicion of pneumonia," she felt J.C.'s subdural hemorrhage "was pretty central" to his death. So even though Curtis's postconviction experts had coalesced around a cause-of-death theory, it was not without doubt, and it conflicted with the defense experts at trial. *See Concepcion*, 2021 WL 811164, at *3 (rejecting applicant's actual-innocence claim and finding a

reasonable juror faced with conflicting views between defense experts "could lend greater credence" to the State's expert opinion). Most importantly, while Curtis's experts in both proceedings generally testified that they did not see any signs of abuse or trauma, they mostly agreed that J.C.'s symptoms—including the brain swelling, subdural hemorrhages, and retinal hemorrhages—were consistent with abuse and trauma.

Turning next to Curtis's arguments about Dr. Jones's conviction, he never tied Dr. Jones's criminal actions to any alleged incompetency in his treatment of J.C. As for Curtis's proposed testimony that he was a loving and attentive father, we find that would have had little effect on the verdict when the battle of the experts was at the forefront of the case. Last, Curtis argues "the State's theory as to [J.C.]'s collapse is unsupported medically, scientifically, or by the evidence." But this is simply a claim that the State's proof was legally insufficient, which does not satisfy the requirements for a claim of actual innocence. *See Dewberry*, 941 N.W.2d at 7.

Overall, we find the State's case could allow a reasonable fact finder to find Curtis guilty, even in light of all the opposing evidence presented at Curtis's criminal trial and on postconviction relief. We accordingly affirm the district court's rejection of the actual-innocence claim, concluding that Curtis did not meet the demanding test to show that no reasonable fact finder could convict him for the first-degree murder of his infant son. *See Schmidt*, 909 N.W.2d at 797.

**B.      Due Process and Prosecutorial Misconduct**

Curtis finally claims the district court erred in denying his claim "that certain statements made by the prosecutor in closing argument" denied him a fair trial.

Specifically, he argues "the prosecutor made the improper argument that he had proved [J.C.]'s hospitalization in May for failure to thrive was the result of prior trauma and strongly implied that [Curtis] was aware of it," highlighting the following passage from the prosecutor's lengthy closing:

> This child had trauma to the head significant but non-fatal in May. Certainly not going to accuse that man of doing it. He's not charged with it and we haven't proved that beyond a reasonable doubt. That would be irresponsible to take that into court. But it's not irresponsible to make that argument to you because you need to understand the history that you're dealing with when [J.C.] was killed July 14th.

Curtis complains this was uncharged conduct that was not supported by the evidence.

Bypassing the State's error-preservation and waiver arguments, *see State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999), we elect to resolve the claim on the merits. A due process claim based on prosecutorial misconduct requires (1) "proof of misconduct" and (2) "proof the misconduct resulted in prejudice to such an extent that the defendant was denied a fair trial." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003).

The jury was instructed to base its "verdict only upon the evidence and these instructions," which expressly does not include "[s]tatements, arguments, questions, and comments by the lawyers." The complained-of statement fell within this exclusion and was brief in comparison to the entire closing argument itself, not to mention the lengthy trial; any prejudicial effect was therefore mitigated. *See, e.g., State v. Plain*, 898 N.W.2d 801, 821 (Iowa 2017) (observing a complained-of statement "was limited to closing arguments and the district court instructed jurors that '[the] summations and closing arguments of counsel are not evidence,' thus

mitigating the term's prejudicial effect" (alteration in original)); *State v. Brown*, No. 07-1479, 2008 WL 5235495, at \*3 (Iowa Ct. App. Dec. 17, 2008) (finding no *Graves* prejudice where "[t]he conduct was neither severe nor pervasive" and "[t]he court instructed the jury that 'statements, arguments, questions, and comments by the lawyers' were not evidence and were not for the jury's consideration or to be used as a basis for the verdict"). Because courts presume juries follow the court's instructions, *State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010), Curtis cannot show prejudice. So we affirm the district court on this point as well.

## V. Conclusion

We reverse the district court's ruling on the State's appeal, finding that Curtis did not meet his burden to prove a breach of duty on the ineffective-assistance claim upon which he was granted relief. We remand for the district court to consider the remaining ineffective-assistance claims it did not previously address. We affirm on Curtis's cross-appeal, finding the court properly rejected his claims of actual innocence and a due process violation based on prosecutorial misconduct.

**REVERSED AND REMANDED WITH DIRECTIONS ON APPEAL; AFFIRMED ON CROSS-APPEAL.**